Opinion of the court delivered by
Judge Whyte.
At the November term of the county court of Smith county 1828, a presentment was made by the grand jury against the plaintiffs in error, to which they pleaded not guilty. Yerdict and judgment were rendered against them in the county court, from which they took an appeal to the circuit court of Smith county; and at the October term thereof, a trial was had in the case, and verdict of guilty found against the plaintiffs. The jury at the same time assessed a fine against the plaintiff, Grisham, of $>109 50, and a fine against the plaintiff, Ligan, of ‡109 50, for which sums respectively, according to the assessment by the jury, the court rendered judgment with costs, and that they be in custody for the payment of the fines and costs; and also that Grisham be imprisoned in the common jail of Smith county for the space of three months. From this judgment, and the judgment of the court in refusing a new trial, the plaintiffs in error took an appeal in error to this court. The errors assigned are to the charge of the court, the rendering the judgment, and refusing a new trial.
The presentment charges, that John Grisham, yeoman, and Jane Ligan, spinster, being scandalous and evil dis-
*592 For the plaintiffs in error, it was contended, that the testimony of the witness, Exum Whitley, showed and proved the assent of these parties to be husband and wife, and to live together as such, thereby forming the contract of matrimony, and constituting a marriage by the common law; and consequently, that their connexion and intercourse subsequently to that time, 1825, is not illicit; prior to which time, there is no pointed evidence of this connexion. This defence is not sustainable. The contract of marriage is a civil contract, dependent respectively upon the law of each and every country or sovereignty; and its constitution directed and controlled by the municipal regulations of such country or sovereignty, prescribing its rites and forms of solemnization.
The common law form of solemnization, by verbal contract, expressing the- assent’ of the mind and living together, which is presumed by the argument to have been brought by our ancestors along with them upon their emigration from England, and forming originally a part of their colonization code of law, cannot now be considered as being of any force and validity, after the colonial governments took up the subject of marriage contract and legislated upon it, making enactments and prescribing rules and regulations for its solemnization, altogether inconsistent with, and repugnant to common law in this respect, v Accordingly, since the year 1741, at the least, the common law mode of constituting a legal marriage, is of no validity here. This point was examined at some length in the case of the State vs. Bashaw, (1 Yer. Rep. 177,) and this conclusion arrived at and sustained by the court.
This common law marriage, testified respecting, and spoken' of by the witness, Whitley, being merely a void act in reference to the constitution of a valid marriage in this State, is no answer to, or defence against the charge in the presentment. The oath administered by the wit# ness to the parties, only aggravates the offence instead of mitigating its criminality; and the whole ceremony, when taken in conjunction with the testimony of the wit *593 ness Belfour, who said that Grisham told him they were not married, is proved to be a sham and pretence, no doubt intended as a veil, though a thin one, to cover the illegality, and as a shield to defend them from the consequential animadversion of the laws of the land operating upon the real transaction.
It is next advanced in argument by the counsel for the plaintiffs in error, that if this assumed common law marriage will not avail as a justification of the conduct exhibited by the proofs in the record, and be a defence protecting them against the conclusion of the law arising upon the charge in the presentment, yet, that the evidence does not prove the existence of the facts in the manner required by law to reach the presentment. To this it is answered, that the presentment charges their existence to have been open, notorious and public. TJje question here made is, were the facts so? that is, open, notorious and public. Surely, after reading this bill of exceptions, it would be a perfect waste of time to enter into an examination in illustration of the affirmative position; that these acts were open, notorious and public, is undoubted; and they are proved to be facts of that character, and thus estimated, and passed upon by the jury.
Secondly. It is insisted for the plaintiffs in error, that to support the criminal allegations in the presentment, which it is argued, amount to open and notorious lewdness, the acts stated must be shewn to have been committed in public, such as in the streets of a town, or elsewhere exposed to the view of divers persons. And the case of the Commonwealth vs. Catlin, (1 Mass. Rep. 8,) was cited. That was an indictment brought on a statute of the state of Massachusetts, the provisions of which are not stated in the report, and the statute itself has not been seen. The report of the case in the book is, that on an indictment under the statute, for open and gross lewdness and lascivious behaviour, evidence of lewdness, or such behaviour in secret, will not support the indictment. This case, therefore, wholly de *594 pendent upon the particular provisions of a statute, can have but little, if any application to the present case, which is a presentment at the common law. It will not therefore, be remarked upon or further noticed.
The common law is the guardian of the morals of the people, and their protection against offences notoriously against public decency and good manners; and Blackstone says, that open and notorious lewdness, either by frequenting houses of ill-fame, which is an indictable of-fence, or by some grossly scandalous and public indecency, is cognizable by the temporal courts. At one time in England, the superintending care and concern of the law for the advancement of public morality, was carried to so great an extent, that incest and adultery were made capital offences, and the repeated act of keeping a brothel, or committing fornication, were (upon a second conviction) made felony without benefit of clergy. This statute was made during the commonwealth, when the ruling powers, says Blackstone, found it to their interest to put on the semblance of very extraordinary strictness and purity of morals; but it was not thought proper at the restoration to revive this statute and renew it, being of such unfashionable rigor; since which time, these offences have been left to the feeble coercion of the spiritual courts, and the temporal courts take no cognizance of the crime of adultery, otherwise than as a private injury. See 4 Black. Com. 64, 65.
This is the substance of Judge Blackstone’s review of the law of England, upon the offences of adultery and fornication, and the other offences noticed; upon which it appears, that even in England, at this day, the case made by this record is the proper subject of an indictment, that is, a grossly scandalous and public indecency, for which the punishment is by fine and imprisonment. When' Judge Blackstone says, that the crime of adultery is not taken cognizance of by the temporal courts, this is to be understood of secret and private adultery; for if open and notorious, it comes within *595 his description of a grossly scandalous and public inde-
But let it be understood that the temporal courts England have no cognizance of the crime of adultery or fornication, when secret and private and confined to single instances, yet, they are not thereby legalized, or rendered dispunishable, as not being offences; they continue offences there still, but their cognizance is transferred and assigned to the spiritual court, who punish according to the rules of the canon law. It cannot follow as a consequence, that an offence which is common to both the law of England and this State, and is animadverted upon by the law of England, and punished by the spiritual court there, shall escape the like animadversion of the law and punishment here, because we have not a spiritual court; but it rather follows from analogy, that our county courts of pleas and quarter' sessions have the jurisdiction in these matters, as we find that matters, the proper tribunal of which was the spiritual court in England, are in this State, when not repugnant to our constitution and form of government, assigned to the county courts, as the probate of wills and testaments, the granting of letters of administration, &c.
But in addition to analogy, we have the express authority of the common law, as declared by the judges in the courts of justice, who, as Blackstone observes, are the living oracles and depositories of the law; (see 1 Black. Com. 68, 69;) that all offences against good morals are cognizable and punishable in the temporal courts, that are not particularly assigned to the spiritual court. Thus, in the case of the King vs. Sir Francis Blake Delaval, (Bur. Rep. 1434,) Lord Mansfield says, “it is true, that many offences of the incontinent kind, fall properly under the jurisdiction of the eclesiastical court, and are appropriated to, it. But if you except those appropriated cases, this court is the cusios mo-rum, (the guardian of the morals of the people,) and has the superintendency of offences contra bonos mores,” (against good manners;) and upon this ground, he *596 adds, “both Sir Charles Sedley, and Curl, who had been guilty of offences against good manners, were prosecu- \ ted here.” Thus we find the commom law (independent of any statutes) is the guardian of the morals of the people, takes cognizance of offences against good manners, and this cognizance belongs to the temporal courts in England, in all those cases where there is not an appropriation of them to the spiritual court.
The result of this view of the law is, that acts or conduct notoriously against public decency and good manners, constitute an offence at common law, cognizable by the temporal courts even in England, as in the case above cited, of the King vs. Delaval, which was for notoriously living with a kept mistress, and in the cases of Sir Charles Sedley and Curl, above mentioned, who had been guilty of offences against good manners. Now, what is the gist of the above prosecutions? It is this, that the act or acts, or particular conduct charged, be notorious and against good manners, not that they should have been committed in the public streets, or elsewhere exposed to the view of divers spectators. Such an exhibition as this, is not necessary to satisfy the term notorious, and portray its character and import. The requisition of the term notorious, or notoriously, in the con-' stitution of an offence of thé nature spoken of, is sufficiently answered, if the act is done in such a manner, or under such circumstances as necessarily to become public, or generally known in the neighborhood. As in the case before Lord Hardwicke, where it appeared in a cause in the court of chancery, that a man had formally assigned his wife over to another man, Lord Hardwicke directed a prosecution for that transaction, as being notoriously against public decency and good morals.
Thirdly. It is objected, that there is error in the charge of the court. As to this, it need only be observed, that if there is any error in the charge, it is in favor of the ' plaintiffs in error, in requiring circumstances not necessary to be shown in the proof in the present case, for the *597 purpose of supporting the prosecution, as presenting-themselves at'public worship, &c. &c.
B. L. Ridley, for the State.
James Rucks, for defendants.
It is therefore the opinion of this court, that the plaintiffs in error were legally convicted, and there is no ground of reversal. The judgment of the circuit court will therefore be affirmed.
Judgment affirmed.