BEMIS PENTECOSTAL CHURCH, Calvary Baptist Church, Englewood Baptist Church, First Assembly of God, First Baptist Church of Bemis, First Baptist Church of Jackson, Malesus Baptist Church, North Jackson Baptist Church, Northside Assembly of God, Popular Heights Baptist Church, Skyline Church of Christ, West Jackson Baptist Church, and Woodland Baptist Church, Plaintiffs-Appellees,

v.

STATE of Tennessee, Michael Cody, the Attorney General of the State of Tennessee, Jerry Woodall, District Attorney of the Twelfth Judicial Circuit of the State of Tennessee, and David Collins, State Election Coordinator of the State of Tennessee, Defendants-Appellants.

Supreme Court of Tennessee,
at Jackson.

May 26, 1987.

W.J. Michael Cody, Atty. Gen. and Reporter, Michael W. Catalano, Andy D. Bennett, Deputy Attys. Gen., Nashville, Jerry Woodall, Dist. Atty. Gen., Jackson, for defendants-appellants.

Michael T. Tabor, Ivy E. Scarborough, Jackson, Lee Boothby, pro hac vice, Berrien Springs, Mich., for plaintiffs-appellees.

Robert C. Taylor, Brenda Measells Dowdle, Taylor, Schlater, Lassiter, Tidwell, and Trentham, Nashville, for Executive Bd. of Tennessee Baptist Convention.

Larry L. Crain, Brentwood, John W. Whitehead, Manassas, Va., for Rutherford Institute.

DROWOTA, Justice.

This case presents a constitutional challenge to the Campaign Financial Disclosure Act of 1980, T.C.A. §§ 2–10–101, *et seq.* (the Act). The Plaintiffs, thirteen churches in the Jackson area,[1] brought this declaratory judgment action in the Chancery Court of Madison County, alleging that the Act violated their First and Fourteenth Amendment rights under the Constitution of the United States. Defendants are the State of Tennessee, the State Attorney General, the District Attorney General for the Twelfth Judicial Circuit, and the Election Coordinator of the State of Tennessee.

---

1. Bemis Pentecostal Church, Calvary Baptist Church, Englewood Baptist Church, First Assembly of God, First Baptist Church of Bemis, First Baptist Church of Jackson, Malesus Baptist Church, North Jackson Baptist Church, Northside Assembly of God, Popular Heights Baptist Church, Skyline Church of Christ, West Jackson Baptist Church, and Woodland Baptist Church.

## I.

In August, 1984, the City of Jackson held a local option referendum to determine whether liquor-by-the-drink would be approved by the residents of the city pursuant to T.C.A. § 57–4–103. Prior to the referendum, Plaintiffs participated in a campaign to oppose the adoption of on-premises liquor consumption in Jackson. They purchased radio, television, and newspaper advertisements expressly opposing the adoption of the local liquor option. At least one of the Plaintiffs contributed money to a political campaign committee, Citizens Against Drug Abuse, which actively campaigned to defeat the local option proposal; another contributed $100 to the Madison-Chester Association of Baptists for the purchase of advertising expressing opposition to the local option measure. Concurrently, a number of the Plaintiffs, as part of their regular and continuing program of broadcasts of their religious services, broadcast sermons in which opposition to the referendum question was expressed. Church newsletters regularly published and distributed by Plaintiffs to their members and other interested individuals included expressions of opposition to the adoption of the local option. The total amount contributed and spent by all Plaintiffs to defeat the referendum measure was $5,150. No church filed a disclosure statement as required by the terms of the Act. Before the election scheduled for August 2, 1984, Defendant David Collins, the Election Coordinator of the State, received an anonymous letter concerning the legality of a newspaper advertisement placed in a local newspaper by one of the Plaintiffs. This advertisement urged voters to cast their ballots against the local option, identified the sponsoring church, and offered to provide transportation to the polls on election day. Because a local election was involved, Mr. Collins forwarded a copy of the letter and advertisement to the local District Attorney General, Jerry Woodall, for any appropriate action. On August 9, 1984, General Woodall requested a formal opinion from the State Attorney General's Office, submitting the question of whether a church that donates funds to a group organized to defeat a local liquor measure must comply with the Campaign Financial Disclosure Act. On August 29, 1984, the Attorney General issued his opinion that such a church would be required to file a disclosure statement with the county election commission. The following day, General Woodall notified Plaintiffs that they must comply with the Act by September 17, 1984. On September 10, 1984, Plaintiffs filed this declaratory judgment action pursuant to T.C.A. § 29–14–101, *et seq.*, and Rule 57, T.R.C.P. They sought a temporary injunction to prevent enforcement of the Act pending the outcome of this litigation. An Agreed Order was entered on September 13, 1984, in which the Defendants agreed that the failure of the Plaintiffs to file certain statements and disclosure reports as required by the Act would not be considered as a willful violation of the Act[2] for a period not to exceed thirty days after the final disposition of the case on appeal. Subsequently, the case was heard on August 7, 1985, in Madison County Chancery Court.

In addition to the testimony of the ministers and pastors of several of the Plaintiff-churches, a Stipulation of Facts was submitted as part of the evidence at trial. Plaintiffs also called a number of prominent expert witnesses to testify in the area of church-state relations. Among the stipulations were included the facts that each church has two or more members in its congregation and that the local option had been defeated by a vote of 6,514 to 6,474.

Testimony at trial primarily focused on the motives and activities of the Plaintiffs in opposing the adoption of the local liquor option. Much of the testimony concerned the sources, amounts, purpose, and fre-

---

**2.** The Act contains penalty provisions. T.C.A. § 2–10–110(a) provides for a fine not to exceed $1,000.00 and (c) provides that "any person who willfully violates" the Act is guilty of a misdemeanor.

quency of expenditures to defeat the measure. In several instances the money used to purchase media advertisements had been appropriated from the general treasury funds of the churches; in other instances, special collections had been taken specifically for campaign expenditures or contributions. Church organization was discussed to the extent necessary to show how spending decisions had been made. We emphasize that several Plaintiffs purchased media advertisements in which they specifically expressed their opposition to the local option and encouraged voters to reject the adoption of liquor-by-the-drink in Jackson and that these activities were in addition to the television and radio broadcasts of their church services or the distribution of their newsletters.

Following the August 2, 1984, referendum concerning liquor-by-the-drink, a second referendum was held in November, 1984, to determine whether package liquor stores would continue to operate in Jackson. Because of the ongoing controversy in this case, several of these churches refrained from participating in the November referendum campaign. Evidence also showed that none of these churches had endorsed or otherwise participated in any candidate elections to support or oppose particular candidates. They were active in liquor campaigns because, while they did not view candidate campaigns as appropriate matters for church involvement (especially in view of the diversity of political persuasions among the individual members of each congregation), liquor referenda involve moral issues on which the churches' congregations are generally unified and about which the churches have defined positions opposing the consumption of alcohol on theological grounds.

Of the ministers and pastors who testified for Plaintiffs, each objected to his church being labeled as a political campaign committee for any purpose because they believe that public questions such as liquor referenda are primarily moral and not political issues. Plaintiffs' expert witnesses provided additional reasons for this objection and for the general opposition of the churches to the disclosure requirements of the Act; they also offered testimony concerning government regulation of religious activities.

On October 30, 1985, Chancellor Morris issued his Memorandum Opinion. He found from the record that the terms of the Act applied to the activities of these Plaintiffs during the referendum campaign. He determined that any group that participated in elections in Tennessee by receiving contributions or by making expenditures over the minimum statutory amounts specifically to oppose or support a candidate or measure was required to disclose this information under the Act, concluding that such a requirement was not unconstitutional for any reason. The Final Order was entered on November 26, 1985, and on the same day Plaintiffs filed their Notice of Appeal. The Court of Appeals reversed the judgment of the Chancery Court in a split decision. The majority held that the Act burdened free speech and, absent any compelling state interest, was thus unconstitutional as applied to referenda elections. In his dissent, Judge Crawford argued that the informational purpose of the Act and the State's interest in deterring corruption or its appearance were sufficiently compelling to justify a simple and narrowly applicable disclosure requirement, pointing out that the United States Supreme Court decisions on which the majority relied dealt with limitations or prohibitions on contributions, not with a disclosure requirement like that of the Act. He also noted that the liquor industry is one of the most heavily regulated and controversial areas of Tennessee society, astutely observing that the majority's result would ironically permit large sums of money to be spent by groups who would profit from maintaining a dry county and that these Plaintiffs could unwittingly find themselves in an unholy alliance with these adverse interests with whom they have no moral common cause—but without realizing it because none of the referendum campaign participants would be required to

disclose financial support of a particular result in a referendum.[3] The dissent found no constitutional objections to a simple disclosure requirement such as that imposed by this statute. We agree with Judge Crawford and reverse the judgment of the Court of Appeals.

## II.

### A.

The authority of the Tennessee Legislature to control the conduct of elections held in this State is manifest. *See Trotter v. City of Maryville*, 191 Tenn. 510, 235 S.W.2d 13 (1950). The Tennessee Constitution provides that "[t]he General Assembly shall have power to enact ... laws to secure the freedom of elections and the purity of the ballot box." Art. IV, § 1, Tennessee Constitution. Article I, § 5, of our Constitution further provides that the elections in this State "shall be free and equal," and Article XI, § 10, encourages internal improvements in the State. Moreover, the effective exercise of the right to vote is essential to the continued existence of democratic institutions. That the right to vote is individual and fundamental is not only recognized in the Tennessee Constitution, but the Constitution of the United States contains not less than four amendments preserving and protecting this right. *See* Amendments Fifteen, Nineteen, Twenty-four, and Twenty-six, Constitution of the United States. Article IV, § 4, of the Federal Constitution assures the States a republican form of government, placing the exercise of the right to vote at the foundation of our system of government. The informed exercise of that right by every qualified individual enhances the integrity of and public confidence in the government.

Pursuant to its general powers over the conduct of elections, Title Two of the Tennessee Code was enacted. T.C.A. § 2–1–102 provides that the purpose of Title Two

"is to regulate the conduct of all elections by the people so that:

(1) the freedom and purity of the ballot is secured;

(2) Voters are required to vote in the election precincts in which they reside except as otherwise expressly permitted;

(3) Internal improvement is promoted by providing a comprehensive and uniform procedure for elections; and

(4) Maximum participation by all citizens in the electoral process is encouraged."

Title Two controls "[a]ll elections for public office, for candidacy for public office, and on questions submitted to the people...." T.C.A. § 2–1–103. A "question" is defined in T.C.A. § 2–1–104(a)(21) as "a statement of a constitutional amendment or any other proposition submitted to the vote of the people...." *Cf.* T.C.A. § 2–10–102(7). T.C.A. § 2–3–204 controls the time and place for elections on questions. In other provisions of the Tennessee Code, referenda are authorized for submission of questions directly to the people.[4] *See, e.g.,* T.C.A. §§ 5–1–209, 5–3–104, 7–2–106, 7–2–107, 43–14–209, 43–14–219, 44–19–105, 57–3–106, and 57–4–103. Recently, the Legislature authorized local option referenda on horse racing as well. A perusal of these statutes reveals that these are generally important questions for localities that directly affect the quality of life, the availability of revenues, and the conduct of local economies.

In the context of the essential place occupied by the electoral process in our society, the Legislature enacted the Campaign Financial Disclosure Act of 1980, T.C.A. §§ 2–10–101, *et seq.* The record in this case includes a transcript of the floor

---

**3.** Plaintiffs would probably want to know if liquor industry interests were spending significant funds in a local option referendum to support the very outcome that they oppose; with that information they could more effectively determine when and how much money should be spent to counter their opponents' arguments.

**4.** Article XI, § 9, Tennessee Constitution, directly authorizes municipalities to submit the question of home rule to the voters of the municipality.

debate over the passage of the Act.[5] This legislative history reveals that the Act was passed to simplify and displace similar legislation enacted in 1975 by reducing the number of officials subject to the Act, by limiting the application of the Act's disclosure requirements, and by making filing, accounting, and compliance procedures less burdensome. The Act as currently written is less cumbersome than the previous campaign disclosure statute. Although concerned primarily with candidate elections, the Legislature did intentionally retain those provisions of the Act applicable to funds used to support or oppose a referendum question. In particular, the recent growth of standing political action committees was of concern to the Legislature. *Cf.* T.C.A. § 2–10–102(8). Moreover, T.C.A. § 2–10–102(10) was drafted to encompass any combination of two or more persons within the meaning of a "political campaign committee" to insure that every group participating in a particular election to attempt to affect the voting outcome could not avoid the disclosure requirements. The General Assembly clearly intended that referenda campaigns would be included in the disclosure requirements of the Act.

■ No significant dispute exists in this case that, as written, the Act applies to the Plaintiffs. Under T.C.A. § 2–10–102(10), these churches are combinations of two or more individuals making expenditures to support or oppose a measure, § 2–10–102(10)(A), or are organizations making expenditures to support or oppose a measure, § 2–10–102(10)(B), or are associations or other groups of persons that receive contributions or make expenditures to support or oppose any measure during a calendar quarter in an aggregate amount exceeding two hundred fifty dollars ($250), § 2–10–

102(10)(C). In addition, T.C.A. § 2–10–102(7) defines a measure as "any proposal submitted to the people of the entire state, or any political subdivision of the state for their approval or rejection at an election...." Apparently, all of the Plaintiffs received or made contributions or made expenditures within the meaning of T.C.A. §§ 2–10–102(3), (5) to influence the outcome of the vote in the local liquor referendum; thus, for the narrow purposes of the Act, these churches constitute political campaign committees.[6] Consequently, T.C.A. § 2–10–105 is triggered.

Under T.C.A. § 2–10–105, the Plaintiffs are required to file disclosure statements with the county election commission. T.C.A. § 2–10–105(b). The name and address of a political treasurer must be certified by each Plaintiff and all records used to complete the disclosure statements must be retained pursuant to T.C.A. §§ 2–10–105(e), (f). T.C.A. § 2–10–107 establishes the content of the required statements. This section provides that a disclosure statement for a political campaign committee that has not spent over $1,000 or received over $1,000 in contributions may file a disclosure statement showing these simple facts without elaboration. T.C.A. § 2–10–107(a)(1). If the contributions received or the expenditures made by a political campaign committee, as defined for the purposes of the Act, exceed $1,000, then the committee must file a more detailed or itemized statement as required by T.C.A. § 2–10–107(a)(2). In this regard, we note that on this record many of these Plaintiffs appear to have contributed, received, or spent no more than $1,000 to influence the August, 1984, referendum outcome and thus would be subject only to the minimal disclosure requirements of T.C.A. § 2–10–

---

**5.** *Legislative Journal, 1980 Tenn.Public Acts, Ch. 861,* §§ 1 through 14; Senate Debates, Senate Bill 1143 (Senate Tapes 53, 54, 60, 61, 101, 127; taped February 28, 1980, March 5, 1980, March 27, 1980, and April 18, 1980), and House Debates, House Bill 945 (House Tapes 64, 87, 91, 92, 103, 149; taped April 4, 1979, March 24, 1980, and April 19, 1980), 91st General Assembly.

**6.** The ultimate content of Plaintiffs' disclosure statements is not determined by this opinion; we decide only whether the Act may apply to these Plaintiffs without violating their free speech rights.

107(a)(1). The Act does not impose stringent organizational requirements for compliance and these consist primarily of certification of a political treasurer, an address, periodic disclosure filings, and notarization of verification signatures. None of these requirements would impose any duties on the Plaintiffs that could not be readily performed within the churches' present organizations.

### B.

■ On appeal, Plaintiffs have raised a number of constitutional issues, but in the context of the application of the Act to referenda, we think that the sole determinative issue is whether the Act violates the free speech clause of the First Amendment to the Constitution of the United States. We find it unnecessary to address the other issues to resolve this case. *Cf. Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 653, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981) (Religious and nonreligious organizations enjoy equal rights "to enter a public forum and spread their views ...."). In the circumstances of this case and especially in view of the broad holding of the Court of Appeals, invalidating the Act as unconstitutional as applied to all groups in all referenda elections, Plaintiffs stand or fall on the free speech issue. We also observe here that, although the referendum about which this case originally arose is over, the case is not moot because the situation is very likely to be repeated when other referenda are held in this State.

### C.

■ The standard of review for this case is strict scrutiny. The nature of the right, to free speech, is fundamental. The exercise of this right is at the core of the political process within which the Act applies and out of which this case arose. Free association rights under the First Amendment are also implicated but rest upon the same grounds as Plaintiffs' free speech rights in this case. The United States Supreme Court has made it clear "that regulation of First Amendment rights is always subject to exacting judicial review." *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981). Under this standard of review, the State must demonstrate that the burden placed on free speech rights is justified by a compelling State interest. The least intrusive means must be utilized by the State to achieve its goals and the means chosen must bear a substantial relation to the interest being served by the statute in question.

Considering that the results of a referendum often entail enduring and significant changes in community life and that diverse interests compete to influence the public policy of the State at every level of political action, the public has the right to know at a minimum how campaigns on public issues are financed and by whom. Large undisclosed contributions can distort public sensibilities and allow confidence in the electoral system to wane as the perception waxes that elections can be unduly influenced by wealthy special interests and well-financed factions. The Legislature has determined that disclosure is a sufficient remedy for the effects of the concentration of wealth on elections and has refrained from imposing any limitations on contributions and spending by any group, relying on an informed electorate to decide the appropriate response to the competing arguments presented in the course of a campaign. The Alaska Supreme Court, construing that State's campaign disclosure act, observed that

> "[t]he need for an informed electorate applies with full force to ballot issues. Such issues are often complex and difficult to understand. Proper evaluation of the arguments made on either side can often be assisted by knowing who is backing each position. We have long recognized in court proceedings the importance of revealing to the decision maker the biases and motives of witnesses.... Similarly, a ballot issue is often of great importance financially to its pro-

ponents or opponents, or both, and multi-million dollar advertising campaigns have been waged. In such circumstances the voter may wish to cast his ballot in accordance with his approval, or disapproval, of the sources of financial support."

*Messerli v. State*, 626 P.2d 81, 87 (Alaska 1980).

That the State's interest is compelling is shown by the State's Constitutional provisions protecting the integrity and fairness of the political process. Moreover, assuring public avenues for disseminating information to protect the electoral process furthers the public interest in open government. The availability of such information not only underwrites the reliability of election results as a reflection of popular will, but it also preserves the integrity of the system by deterring corruption and the appearance of corruption. Disclosure assures contributors that their money has been spent in the manner for which it was solicited or for which it was donated. Prevention of fraudulent fund-raising or of funding of campaign activity by front organizations is made more feasible, justifying disclosure both of contributions and expenditures as two sides of the same coin. Records-keeping and routine disclosure further these State interests by preserving a paper trail by which the conversion of contributions into legitimate expenditures may be traced. One need only recall the infamous Watergate slush fund to recognize the necessity of such records and of periodic disclosure requirements.

The recent history of campaign financial abuses as well as the growth and possible dominance of special interest political action committees make the State's disclosure requirements necessary to allow the public to have some gauge by which to assess the sources, content, and frequency of campaign publicity and activity. The informational purpose of disclosure is no less compelling in referenda. Referenda are the most direct expression of popular will and should be conducted in an open forum for the debate of public policy. Unlike candidate elections, which recur periodically to provide the electorate the opportunity to oust unpopular or corrupt public officials, referenda often commit the State or its political subdivisions to what may be, as a practical matter, essentially irreversible and costly courses of action. Vigorous, free, well-informed, and public debate can only be enhanced by disclosure of campaign financing in both referenda and candidate elections. No faction with access to substantial financial resources should be able to distort the process by flooding the forum with media campaigns without at least disclosing this fact to the voters. Any group that wishes to participate in the process through the financing of election outcome specific advocacy should reveal the extent of this financial involvement to the public. This is all that the people of Tennessee have asked of groups directly participating in an election campaign through the mechanism of the Campaign Financial Disclosure Act.

■ The United States Supreme Court has apparently approved the kind of simple disclosure requirements imposed by Tennessee's Act. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (*Per curiam*), which dealt with the constitutionality of the Federal Election Campaign Act, the Supreme Court stated that a narrowly construed disclosure requirement is generally within constitutional bounds. 424 U.S. at 61, 96 S.Ct. at 654. Noting the long history of Federal disclosure laws, 424 U.S. at 61–62, 96 S.Ct. at 654–655, the Court determined that "disclosure requirements, as a general matter, directly serve substantial government interests. In determining whether these interests are sufficient to justify the requirements we must look to the extent of the burden that they place on individual rights." 424 U.S. at 68, 96 S.Ct. at 658. We observe here that the Supreme Court upheld the Federal disclosure requirements in *Buckley*, 424 U.S. at 84, 96 S.Ct. at 666, although it did note that such requirements could infringe on priva-

cy of association, 424 U.S. at 64–65, 96 S.Ct. at 656.[7]

Tennessee's Act imposes a system of graduated disclosure requirements that depend on the degree of financial involvement in the campaign and the nature of the office or activity. Under T.C.A. § 2–10–101(b), the Act does not even apply to certain offices and sets a floor amount at which application of the Act is triggered in a number of situations. T.C.A. § 2–10–102(10)(C) permits clubs, committees, associations, or other groups not otherwise covered by the Act to receive or spend the aggregate of $250 per calendar quarter to attempt to influence an election outcome without being defined as a political campaign committee. In this case, Plaintiffs appear to have made expenditures and made or received contributions in excess of this amount and thus would not be exempt under this provision.[8] Moreover, two types of disclosure statements are permitted by the Act. T.C.A. § 2–10–107(a)(1) requires only minimal disclosure if contributions received or made and expenditures do not exceed $1,000. Other provisions of the Act allow a certain amount of leeway in its application. *See* T.C.A. §§ 2–10–102(2), (3).

Furthermore, the Act does not apply to financing of generalized discussion of public issues and is triggered only when a group is financing election outcome specific advocacy in a particular campaign. This construction of the Act is consistent with the express advocacy requirement of *Buckley:*

> "*Buckley* adopted the 'express advocacy' requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons [or referenda results]. We therefore concluded in that case that a finding of 'express advocacy' depended upon the use of language such as 'vote for', 'elect', 'support', etc. *Buckley, supra,* [424 U.S.], at 44, n. 52, 96 S.Ct., at 646, n. 52."

*Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* — U.S. ——, 107 S.Ct. 616, 623, 93 L.Ed.2d 539 (1986). In *Massachusetts Citizens for Life,* the Supreme Court again expressly approved simple disclosure requirements as sufficient to serve the State's interest in monitoring campaign financing activities. 107 S.Ct. at 630. In this regard, the Supreme Court found in *Buckley* that disclosure requirements appeared generally "to be the least restrictive means of curbing the evils of campaign ignorance and corruption...." 424 U.S. at 68, 96 S.Ct. at 658.

Plaintiffs' regular and continuing programs of broadcasting their religious services on radio or television or of publishing and distributing church newsletters are not and cannot be considered campaign contributions or expenditures,[9] regardless of whether they advocate a particular election result or not in the course of such activities, as these activities are protected by the First Amendment and are expressly excluded from the operation of the Act under T.C.A. § 2–10–102(3)(B). Only the financing of their direct participation in the campaign, through activities in which Plaintiffs would not otherwise have engaged but for an impending election, trigger the Act. Ongoing or standing political campaign committees, however, would be encompassed under either T.C.A. § 2–10–102(8) or T.C.A. § 2–10–102(10)(C), but the predominantly religious activities of Plaintiffs are not within the scope of the Act and would not result in Plaintiffs being considered political campaign committees for any purpose under the Act. If Plaintiffs published advertisements or other forms of general

---

**7.** This infringement on privacy of association arises when the State compels disclosure by unpopular minority factions whose members could suffer adverse consequences from public exposure, but that is not a danger in this case, which involves mainstream groups such as these churches. *Cf. NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

**8.** See footnote 6, *supra.*

**9.** The Attorney General stipulated at trial that the Act would not be applicable to these activities.

expression that warned of the potential and actual effects of alcohol consumption or other perceived social evils, outside the context of an election campaign or even during a campaign but without financing election outcome specific advocacy, then such activities would not fall within the Act, absent any indication these activities were timed and intended to circumvent the requirements of the Act.[10] Nevertheless, that Plaintiffs in this case contributed and spent funds directly to influence the result of the vote in this referendum is undisputed in this case; such activity as that shown on this record can only be considered financing of election outcome specific advocacy.

While *Buckley* involved the Federal Election Campaign Act, a more complex statutory scheme than that of the Tennessee Act, *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), does appear to be somewhat more instructive because it involved State regulation of referenda campaigns; however, in *Bellotti*, Massachusetts had imposed direct limits on speech and did not simply require financial disclosure. The statute in that case completely prohibited expenditures by banks and corporations to influence certain referenda, in effect silencing them. The Tennessee Act does not impose any direct or indirect limitations on contributions or expenditures. In the course of invalidating this Massachusetts statute as an unconstitutional infringement on free speech, the Court again seems to have implicitly approved the kind of simple disclosure requirements found in the Tennessee Act. 435 U.S. at 792, n. 32, 98 S.Ct. at 1424, n. 32. Although finding that referenda campaigns do not entail the same degree of State interest in deterring corruption as is involved in candidate elections, the Court did recognize that the interests of the government in preserving the integrity of the electoral process is of the highest importance but was not sufficient to justify a *complete prohibition* on speech such as that imposed by Massachu-

setts in referenda campaigns. 435 U.S. at 795, 98 S.Ct. at 1426. Thus, despite the fact that *Bellotti* does involve referenda, it does not address the disclosure issue presented by this case.

More relevant to the case *sub judice* seems to be *Citizens Against Rent Control v. City of Berkeley, supra,* but again the Supreme Court was confronted with whether State limitations on contributions in referenda campaigns were constitutional under the First Amendment's free speech clause. In *Citizens Against Rent Control,* the Court more explicitly approved simple disclosure as "a sufficient prophylaxis to dispel perceptions of corruption" in the initiative process. 454 U.S. at 294, 102 S.Ct. at 436. Simple disclosure appears to have been sanctioned elsewhere in this case as well. 454 U.S. at 298–300, 102 S.Ct. at 438–439. In the context of a referendum, the Court remarked specifically:

> "Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committee there is no significant state or public interest in curtailing debate and discussion of a ballot measure. Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression. The integrity of the political system will be adequately protected if contributions are identified in a public filing revealing the amounts contributed; if it is thought wise legislation can outlaw anonymous contributions."

454 U.S. at 299–300, 102 S.Ct. at 439. *Cf. State v. Acey,* 633 S.W.2d 306 (Tenn.1982) (Construing T.C.A. § 2–19–120, which prohibits anonymous publications about candidates).

■ From these cases, none of which involves the issue as it is presented in this case, we conclude that the United States Supreme Court has implicitly—if not explicitly—countenanced the constitutionality of simple disclosure requirements such as

---

**10.** See footnote 2, *supra.*

those imposed by the Tennessee Act. In the course of invalidating the financial limitations in *Buckley, Bellotti,* and *Citizens Against Rent Control* (the latter two of which involve State regulation of referenda campaigns), the Court has repeatedly intimated that simple disclosure imposed by a narrowly construed statute does not violate the free speech clause as a general matter, at least absent some indication that the disclosure would threaten the existence of an association or result in retaliations against the members of a group. We are convinced that the Act as drafted and construed does not violate the free speech clause of the First Amendment to the Constitution of the United States.

### III.

As enacted, the Campaign Financial Disclosure Act does not and cannot control the quality or content of speech; it does not limit contributions or expenditures made during a campaign; it is neutral in all respects as regards the groups to whom it applies and the types of activities at which it is specifically aimed. The burden placed on election campaign participants is graduated according to the degree of financial involvement and the nature of the office; it does not and cannot interfere with generalized debate or discussion of public issues. The Act is triggered only by pointed attempts to influence the outcome of particular elections by financial participation in the campaign (i.e., financing of election outcome specific advocacy). The Act serves a number of legitimate and compelling State interests ranging from the maintenance of free, open, and fair elections, to dissemination of campaign information to voters, to prevention of corruption and fraud, to records-keeping to permit effective enforcement of the Act. The organizational burdens imposed by the Act are minimal, extending only slightly beyond the necessity to appoint or designate a political treasurer, who could be the regular organizational treasurer, if any, serving in Plaintiffs' churches. The burden of records-keeping

is certainly no greater than that already imposed by other State and Federal laws with which churches must comply. As construed, the Act is a narrow disclosure requirement that is less burdensome than the more extensive Federal counterparts that have been at least partially upheld by the United States Supreme Court.

If any group wishes to engage in financing outcome specific election campaigning, whether involving a candidate election or referendum, the people of the State—including these Plaintiffs—have the right to know the extent of such financial involvement during the campaign in order to maintain a balanced and informed view of the campaign. For each qualified person to exercise an informed vote in a fair, open, and public election process is a compelling state interest for any republican form of government and this interest is expressly provided for in our State Constitution. Effective and meaningful democratic processes ultimately depend on the integrity and reliability of election results. Accordingly, we conclude that the Campaign Financial Disclosure Act of 1980 is constitutional in every respect. Its narrow application serves to enable the informed exercise of the fundamental right to vote in referenda and candidate elections.

The judgment of the Court of Appeals is reversed and that of the trial court is reinstated. The costs are divided equally among the parties.

BROCK, C.J., and FONES, HARBISON and COOPER, JJ., concur.