IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 20, 2022 Session

## SAVE OUR FAIRGROUNDS ET AL. v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 18-952-III          Ellen Hobbs Lyle, Chancellor**

————————————————————

**No. M2021-00074-COA-R3-CV**

————————————————————

Citizens sought to stop the construction and operation of a soccer stadium at The Fairgrounds Nashville. The plaintiffs advanced a plethora of legal theories in support of their claims that the soccer development violated the Metro Charter. After a month-long trial, the court dismissed the plaintiffs' claims with prejudice. On appeal, the plaintiffs raise two issues: (1) whether the trial court's orders were final; and (2) whether the court erred in ruling that the Metro Charter did not require a public referendum before any demolition and new development could occur at the Fairgrounds. We conclude that the court's orders were final. But, because the challenged demolition and construction have already happened, we dismiss this appeal as moot.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal is Dismissed and Case Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT JR., P.J., M.S., and JEFFREY USMAN, J., joined.

James D.R. Roberts, Jr., Dickson, Tennessee, for the appellants Save Our Fairgrounds, Mildred Smith, Neil Chaffin, and Nashville Flea Market Vendors Association.

Lora Barkenbus Fox and Catherine J. Pham, Metropolitan Attorneys, for the appellee Metropolitan Government of Nashville & Davidson County.

John J. Hamill and Mary M. Shepro, Chicago, Illinois, and William N. Helou, Nashville, Tennessee, for the appellees Nashville Soccer Holdings, LLC and Walsh Management, LLC.

# OPINION

## I.

### A.

The Fairgrounds Nashville, an approximately 125-acre tract, is located four miles south of downtown Nashville. The Fairgrounds has been the site of the annual Tennessee State Fair, a monthly flea market, a motorsport racetrack, and various exposition events. In 2011, a majority of Davidson County voters approved an amendment to the Metropolitan Charter related to the Fairgrounds. The amendment provided,

> All activities being conducted on the premises of the Tennessee State Fairgrounds as of December 31, 2010, including, but not limited to, the Tennessee State Fair, Expo Center Events, Flea Markets, and Auto Racing, shall be continued on the same site. No demolition of the premises shall be allowed to occur without approval by ordinance receiving 27 votes by the Metropolitan Council or amendment to the Metropolitan Charter.

Metro Charter pt. I, art. 11, § 11.602(d).

The Metropolitan Government of Nashville and Davidson County ("Metro") owns the Fairgrounds, which is operated by the Metropolitan Board of Fair Commissioners ("Fair Board"). *Id.* pt. I, art. 11, § 11.602(a); *id.* pt. II, art. II, § 10. The Fair Board's duties and authority stem primarily from the Metro Charter. *See id.* pt. I, art. 11, §§ 11.601 to 11.602; *id.* pt. II, art. II, §§ 1-12.[1] But Metro may add to those duties by ordinance. *Id.* pt. I, art. 11, § 11.602(c). The Fair Board's principal duty is to hold an annual "fair or exposition" at the Fairgrounds.[2] *Id.* pt. II, art. II, § 10. Otherwise, it may lease property at the Fairgrounds for educational or amusement purposes as long as the leases do not interfere with the operation of the annual fair. *Id.* pt. II, art. II, §§ 8, 10.

---

[1] By private act, the General Assembly created a board of fair commissioners and granted it certain powers and duties. 1909 Tenn. Priv. Acts 1781 (ch. 490); 1923 Tenn. Priv. Acts 1975 (ch. 515). Section 11.602(a) of the Metro Charter makes those powers and duties applicable to the current Fair Board. Metro Charter pt. I, art. 11, § 11.602(a). And Article II of the Metro Charter reflects the text of chapter 515 of the 1923 Private Act, as later amended. *Id.* pt. II, art. II, §§ 1-12.

[2] Before 2010, the Fair Board held an annual fair at the Fairgrounds known as the Tennessee State Fair. In May 2012, the General Assembly passed the Tennessee State Fair and Exposition Act. Tenn. Code Ann. §§ 4-57-101 to -107 (2021). Under that Act, the Tennessee State Fair and Exposition Commission is the sole body authorized to administer "a state fair and exposition." *Id.* § 4-57-102. And the State controls the use of the name "Tennessee State Fair." *Id.* § 4-57-106. From 2012 to 2019, the Fair Board hosted the Tennessee State Fair at the Fairgrounds under a contract with the Tennessee State Fair Association and/or the Tennessee State Fair and Exposition Commission.

In 2017, Major League Soccer announced that it had awarded a soccer franchise to Nashville. To attract a franchise, Metro agreed to the construction of a soccer-specific stadium and an adjacent multi-use development at the Fairgrounds. It pledged to use half of the property taxes generated by the multi-use development to create a capital fund for the Fairgrounds. Metro viewed the soccer development as an opportunity to attract more people to the Fairgrounds and to create an additional source of funding for the Fair Board.

Metro Council passed a resolution giving conditional approval to the Sports Authority of the Metropolitan Government of Nashville and Davidson County to issue bonds to construct and equip the stadium and related facilities. *See* Tenn. Code Ann. § 7-67-109(15) (2015). The bonds were to be paid with funds generated from a tax on soccer ticket sales. Nashville Soccer Holdings, LLC, the entity that owned the team, agreed to cover any shortfall.

Metro directed the Sports Authority not to sell any stadium bonds until the conditions specified in the resolution were satisfied. One condition was the execution of an operating lease between the Sports Authority and the team containing specific provisions, including "a reasonable mechanism for resolving scheduling disputes between the Team and the Executive Director of the Fair Board."

For its part, the Fair Board approved the terms of a ground lease allowing the Sports Authority to use part of the Fairgrounds for a soccer stadium. It also agreed to a binding term sheet, outlining the basic terms of an operating lease between Walsh Management, LLC, a wholly-owned subsidiary of Nashville Soccer, and the Sports Authority for the operation of the stadium.

In 2018, Metro Council enacted multiple ordinances in connection with the soccer development. One ordinance approved the demolition of the dilapidated buildings and sheds at the stadium site. The approval ordinance, which garnered more than 27 votes, required the construction of new facilities for the existing activities at the Fairgrounds before demolition could begin. Metro also authorized the issuance of general revenue bonds to fund the construction of the new facilities and infrastructure.

At the same time, Metro declared that 10 acres adjacent to the stadium site were surplus property. It rezoned the property to allow a multi-use development. And it authorized the Fair Board to execute a ground lease for the 10-acre site with a subsidiary of Nashville Soccer. The site plan proposed a multi-use development that included residential, retail, and restaurant space. Nashville Soccer agreed to ensure that the developer reserved space for a childcare facility, affordable housing units, and a micro-unit incubator for artisans and small businesses that did not compete with existing flea market vendors.

3

B.

Save Our Fairgrounds is a nonprofit corporation dedicated to promoting and preserving the Fairgrounds. Save Our Fairgrounds, along with several individuals and a nonprofit group representing flea market vendors, sued Metro alleging that the soccer development violated various provisions of the Metro Charter. *See* Metro Charter, pt. I, art. 11, § 11.602; *id.* pt. II, art. II, §§ 8, 10. In the operative complaint, the plaintiffs sought a declaratory judgment that the Metro Charter precluded Metro from "engaging in actions which negatively affect the Fair Board's ability to conduct an annual Fair or any other activities protected by [§ 11.602(d)]" and that "Section 11.602(d) . . . precluded [Metro] from interfering with the traditional protected uses." As additional relief, the plaintiffs requested a writ of mandamus and an injunction restraining Metro from interfering with the existing activities, including the destruction of dedicated parking, the "giving away" of property at the Fairgrounds for nominal consideration, and the demolition of suitable exhibition space without adequate replacement facilities.

Metro moved to dismiss the plaintiffs' claims on multiple grounds. The court granted the motion, in part, and dismissed the claim for a writ of mandamus. The court rejected Metro's other arguments, holding that Metro had an affirmative duty under § 11.602(d) of the Charter to "show it is feasible for the New Uses to be added without substantially reducing or eliminating the Existing Uses in the face of the real and tangible conflicts with the Existing Uses alleged by the Plaintiffs."

In early 2019, the court granted Metro's motion for summary judgment and dismissed the plaintiffs' remaining claims with prejudice. The court ruled that § 11.602(d) mandated that the existing activities at the Fairgrounds be "continued." It did not preclude new activities. Nor was Metro required to adhere to the "previous arrangements or logistics" for the existing ones. Metro Council approved the demolition by more than the prerequisite number of votes. Adequate parking and exhibition spaces were available for the existing activities during construction. And a binding term sheet between the Fair Board and Walsh Management contained "real enforceable protections for the Existing Uses" going forward. The court held that "by negotiating and having [Nashville Soccer] enter into binding contractual obligations to work with and accommodate the Existing Uses, Metro ha[d] complied with its duty under Section 11.602(d)." The court concluded that the plaintiffs' fears that Nashville Soccer would not abide by its contractual obligations were not enough to preclude the grant of summary judgment.[3]

The plaintiffs appealed. *Save Our Fairgrounds v. Metro. Gov't of Nashville*, No. M2019-00724-COA-R3-CV, 2019 WL 3231381, at *4 (Tenn. Ct. App. July 18, 2019).

---

[3] The court also rejected the claims based on alleged violations of an ordinance governing the disposition of surplus property.

4

This Court ruled that the trial court's order only addressed the plaintiffs' complaints about violations of § 11.602(d). *Id.* The claims that the soccer development violated other provisions of the Metro Charter remained pending. *Id.* at *5. Because the order was not final, we dismissed the appeal and remanded for further proceedings. *Id.* at *7.

After remand, Nashville Soccer and Walsh Management joined the fray as intervening defendants. By then, the flea market and exposition events had relocated to the new buildings. The old, abandoned buildings awaited demolition.

Shortly before the scheduled demolition, the plaintiffs moved for a temporary restraining order and/or injunction to keep "Metro from taking any actions to commence any phase of redevelopment of the Fairgrounds Nashville property until a referendum is approved by the voters." They argued, for the first time, that § 11.602(d) required **both** a majority vote in Metro Council **and** a public referendum before any demolition or redevelopment could occur at the Fairgrounds.

After a hearing, the court denied the injunction request. The court ruled that § 11.602(d) unambiguously allowed demolition to occur after **either** a majority vote of Metro Council **or** a charter amendment. *See* Metro Charter pt. I, art. 11, § 11.602(d) ("No demolition of the premises shall be allowed to occur without approval by ordinance receiving 27 votes by the Metropolitan Council or amendment to the Metropolitan Charter."). So the plaintiffs had not shown a likelihood of success on the merits. Nor had they shown any irreparable harm. The buildings were no longer in use. And construction was not scheduled to begin until after a trial on the merits of the plaintiffs' claims. Given that trial was scheduled to begin in three months, the court also denied the plaintiffs' request for an interlocutory appeal of the injunction issue.

As it turned out, trial did not begin that June as scheduled. At the plaintiffs' request, the court continued the trial date twice. When trial finally began in September of 2020, the old buildings had been demolished. And construction of the soccer stadium was scheduled to begin in 2021.

After almost a month of trial, the court issued a final order. The court concluded that the plaintiffs did not prove that the construction and operation of the soccer development were *ultra vires*, a breach of fiduciary duty, or a violation of the Metro Charter. On the other hand, Metro demonstrated that, when the new development was completed, (1) it would still be feasible to host a divisional fair on site and (2) the existing activities would be continued. The court also found that Metro was proceeding in good faith to ensure the continuation of the existing activities at the Fairgrounds. So it dismissed the plaintiffs' claims with prejudice.

5

**II.**

**A.**

The plaintiffs' first issue is whether the trial court's orders are "final appealable orders." They contend that the orders are not final because the court "refus[ed] to address the requirement . . . that the Stadium Lease 'shall include a reasonable mechanism for resolving scheduling disputes.'"

Finality implicates our subject matter jurisdiction. *See Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 559 (Tenn. 1990) ("Unless an appeal from an interlocutory order is provided by the rules or by statute, appellate courts have jurisdiction over final judgments only."). Under Tennessee Rule of Appellate Procedure 3(a), an appeal "as of right" only lies from a final judgment. TENN. R. APP. P. 3(a); *In re Est. of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003). A final judgment "resolves all of the parties' claims and leaves the court with nothing to adjudicate." *Ball v. McDowell*, 288 S.W.3d 833, 836-37 (Tenn. 2009). An order that resolves fewer than all the claims between all the parties is not a final judgment. TENN. R. APP. P. 3(a); *In re Est. of Henderson*, 121 S.W.3d at 645. If we lack subject matter jurisdiction, we are required to dismiss the appeal. *See* TENN. R. APP. P. 3(e); *Davis v. Davis*, 224 S.W.3d 165, 169 (Tenn. Ct. App. 2006).

We conclude that the trial court implicitly found that the operating lease contained a reasonable mechanism for resolving scheduling conflicts. *See Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013) ("[W]hen construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated."). In rejecting the plaintiffs' argument that concurrent events at the Fairgrounds would negatively affect the existing activities, the court highlighted the scheduling provisions in the operating lease. The operating lease required Walsh Management to accommodate the existing activities and to work diligently and in good faith to resolve any scheduling conflicts. Unlike the plaintiffs, the court did not view Walsh Management's contractual duty as a mere "empty promise." The court credited the testimony that it was not uncommon for a team to provide Major League Soccer with "a list of days when they cannot hold home events." And Walsh Management's track record for working with the Executive Director of the Fairgrounds had been "good." Based on these facts, the court found it likely that any scheduling conflicts would be amicably resolved. If not, the operating lease contained a "safety valve" that allowed the team "to hold a limited number of home games at another venue."

Having carefully reviewed the extensive record in this case, we conclude that the trial court resolved all the claims between the parties, leaving it with nothing more to adjudicate. *Ball*, 288 S.W.3d at 836-37. So we have jurisdiction to consider this appeal.

6

B.

Other than finality, the only other issue the plaintiffs raise in this appeal is whether the trial court erred in ruling that "§ 11.602(d) is not ambiguous, and that a voter referendum was not required prior to redevelopment of The Fairgrounds Nashville property." Metro and the intervening defendants argue that this issue is moot given certain post-judgment facts.

We have the discretion to consider post-judgment facts that are "capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness." TENN. R. APP. P. 14(a). But "such facts must be unrelated to the merits and not genuinely disputed." *Edwards v. Hallsdale-Powell Util. Dist.*, 115 S.W.3d 461, 464 n.3 (Tenn. 2003).

Metro asks us to consider a three-page declaration from Laura Womack, Executive Director of the Fairgrounds, as post-judgment facts. Ms. Womack summarized "the changes and activities at the Fairgrounds" since the trial. As noted by the plaintiffs, some of the declaration's content does not meet the criteria of Rule 14(a). But we exercise our discretion to grant Metro's motion, in part.[4] According to Ms. Womack, since the trial, work on the infrastructure projects at the Fairgrounds has continued. The bonds to build the soccer stadium were issued on December 17, 2020. The stadium has been built, and soccer matches have been played. Demolition has been completed on the mixed-use parcel, and construction in that area has begun. These facts are "capable of ready demonstration," not genuinely disputed, and are relevant to the mootness issue. TENN. R. APP. P. 14(a).

For this Court to render an opinion, we must be faced with a "genuine and existing controversy." *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994). A case must remain justiciable from the time it is filed until the moment of final appellate review. *Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203-04 (Tenn. 2009). A moot case is no longer justiciable because it "has lost its character as a present, live controversy" and "no longer serves as a means to provide relief to the prevailing party." *McIntyre*, 884 S.W.2d at 137. Mootness can result from a "court decision, acts of the parties, or some other reason occurring after commencement of the case." *Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 204.

---

[4] The plaintiffs also filed a motion to consider post-judgment facts. They asked us to consider the circumstances surrounding the cancellation of an exposition center event and the 2022 racing schedule at the speedway as post judgment facts. In their view, these facts demonstrate "the absence of the Charter protections" and the lack of a reasonable mechanism to resolve scheduling disputes. These facts go directly to the merits of the litigation. Rule 14(a) "is not intended to permit a retrial in the appellate court." TENN. R. APP. P. 14(a) advisory comm'n cmt. So we decline to consider these post-judgment facts.

7

The plaintiffs filed this action seeking to stop the construction and operation of the soccer development at the Fairgrounds. They alleged that these new activities would negatively impact the existing ones and interfere with the operation of the annual fair. They sought a declaratory judgment that the Metro Charter precluded Metro from implementing the soccer development as planned. And they asked for injunctive relief.

But the changes to the Fairgrounds that plaintiffs sought to prevent have already happened. The new exhibition spaces have been built. The flea market and exposition center events relocated in 2019. The old buildings were demolished in 2020. All the leases and other agreements have been signed and approved. The stadium bonds were issued on December 17, 2020. The stadium has been built, and matches are being played. The site for the mixed-use development has been cleared, and construction is underway. "[A] suit brought to enjoin a particular act becomes moot once the act sought to be enjoined takes place." *McIntyre*, 884 S.W.2d at 137.

Even under the guise of a declaratory judgment, we cannot "render an advisory opinion." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 193 (Tenn. 2000). We will not consider an appeal in a declaratory judgment action "when the question presented is abstract, theoretical or based on a contingency which may or may not arise." *State ex rel. Lewis v. State*, 347 S.W.2d 47, 49 (Tenn. 1961). An actual "case" or "controversy" must still exist. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 837 (Tenn. 2008) (quoting *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 95 (1993)). Even if the plaintiffs were to prevail on appeal, we cannot provide them with any meaningful relief. *Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 204.

The parties have also not articulated any exceptional circumstances that would allow us to reach the merits of this appeal. In our discretion, we may consider a moot issue if (1) it has "great public importance or affects the administration of justice"; (2) "the challenged conduct is capable of repetition and evades judicial review"; (3) there are "collateral consequences"; or (4) "a litigant has voluntarily ceased the challenged conduct." *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013). Based on our review of this record, none of these exceptions to the mootness doctrine apply.

The issue presented here, in some respects, involves citizen-approved limitations on local governmental authority. The plaintiffs claim that they pursued this litigation solely in the public interest, not for personal reasons. Still, the public interest exception does not apply to every issue which garners public attention. *See Dockery v. Dockery*, 559 S.W.2d 952, 955-56 (Tenn. Ct. App. 1977). And the rights at issue here are not of the same ilk as the public rights implicated in previous decisions applying this exception. *See, e.g.*, *Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 211-12 (the right to possess private property); *City of White House v. Whitley*, 979 S.W.2d 262, 266 (Tenn. 1998) (considering "whether a non-attorney judge may preside over a criminal trial potentially resulting in a deprivation of liberty"); *Bemis Pentecostal Church v. State*, 731 S.W.2d 897, 903 (Tenn.

8

1987) (freedom of speech); *Scripps Media, Inc. v. Tenn. Dep't of Mental Health & Substance Abuse Servs.*, 614 S.W.3d 700, 705 (Tenn. Ct. App. 2019) (issue implicating "the ability of Tennessee citizens to access information related to the workings of their public officials"). Nor does this issue seem likely to arise again under similar conditions. *See Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 210 ("[T]he public interest exception should not be invoked if the issue is unlikely to arise in the future."); *State v. Rodgers*, 235 S.W.3d 92, 97 (Tenn. 2007) (emphasizing that the public interest exception only applies to issues involving "a determination of public rights or interests under conditions which may be repeated at any time" (quoting *McCanless v. Klein*, 188 S.W.2d 745, 747 (Tenn. 1945))).

For much the same reason, the issue here does not fall within the exception for issues that are "capable of repetition" while also "evad[ing] judicial review." *City of Memphis*, 414 S.W.3d at 96. In the long history of the Fairgrounds, Metro has rarely made any extensive changes to the Fairgrounds. While there is the possibility of further development at some point, "[a] mere theoretical possibility . . . is not sufficient." *All. for Native Am. Indian Rts. in Tenn., Inc. v. Nicely*, 182 S.W.3d 333, 340 (Tenn. Ct. App. 2005). There must be a "reasonable expectation" or a "demonstrated probability" that this dispute will be repeated. *Id.* (citation omitted). And if this dispute should arise again, the normal processes of judicial review will be available.

Nothing in this record suggests that the remaining two exceptions are applicable either. We are unaware of any prejudicial collateral consequences that an opinion from this Court would alleviate. *See Hudson v. Hudson*, 328 S.W.3d 863, 866 (Tenn. 2010); *Allen v. Lee*, No. M2020-00918-COA-R3-CV, 2021 WL 2948775, at \*3 (Tenn. Ct. App. July 14, 2021), *perm. app. denied*, (Tenn. Nov. 19, 2021) (refusing to invoke the collateral consequences exception when a decision on the merits would not "impact [the plaintiffs'] concern or provide any indirect redress"). And this case did not become moot because Metro altered its conduct. *Cf. Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, 651 S.W.3d 907, 912 (Tenn. 2022).

C.

Our "ordinary practice in disposing of a case that has become moot on appeal is to vacate the judgment and remand the case with directions that it be dismissed." *McIntyre*, 884 S.W.2d at 138; *see also Hudson*, 328 S.W.3d at 866. But that disposition is not automatic. *See Shaw*, 651 S.W.3d at 917 (cautioning courts that the proper disposition of a moot appeal "turns on the facts and circumstances of each case"). This is an equitable decision. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994); *Radiant Glob. Logistics, Inc. v. Furstenau*, 951 F.3d 393, 397 (6th Cir. 2020). Under the circumstances, we choose to dismiss this appeal as moot without vacating the lower court's judgment. *See Perry v. Banks*, 521 S.W.2d 549, 550 (Tenn. 1975) (dismissing appeal as

moot "without expressing any opinion as to the correctness of the [lower court's] decision").

In our view, the plaintiffs are responsible for the mootness of this appeal. *See U.S. Bancorp Mortgage Co.*, 513 U.S. at 24 ("The principal condition to which we have looked is whether the party seeking relief from the judgment below caused the mootness by voluntary action."). They never renewed their request for an interlocutory appeal on the public referendum issue after the trial was delayed. Nor did they seek to stay construction pending appeal. *See Perficient, Inc. v. Munley*, 973 F.3d 914, 917 (8th Cir. 2020) (declining to vacate judgment below when appellants "took no action to avoid mootness"); *In re W. Pac. Airlines, Inc.*, 181 F.3d 1191, 1197 (10th Cir. 1999) (noting that appellants' failure to seek a stay contributed to the mootness of the appeal). And they only raised limited issues on appeal, leaving the rest of the court's judgment unchallenged. *See Radiant Glob. Logistics, Inc.*, 951 F.3d at 397 (reasoning that vacatur was inappropriate because appellant had "slept on its rights" (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950)). This suggests that the judgment below "is not unreviewable, but simply unreviewed by [the plaintiffs'] own choice." *U.S. Bancorp Mortg. Co.*, 513 U.S. at 25.

## III.

The trial court's judgment is final. But we dismiss this appeal as moot.

s/ W. Neal McBrayer
W. NEAL McBRAYER, JUDGE
