**STATE of Tennessee, Plaintiff–Appellee,**

v.

**Dudley W. MARSHALL and Carolyn A. Swanson, Defendants–Appellants.**

Supreme Court of Tennessee,
at Jackson.

May 17, 1993.

Rehearing Denied Aug. 2, 1993.

Frierson M. Graves, Jr., Michael F. Pleasants, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, for defendants-appellants.

Charles W. Burson, Atty. Gen. & Reporter, Jerry Smith, Deputy Atty. Gen., Joel W. Perry, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

John E. Herbison, Donald E. Dawson, Nashville, for amicus curiae The Tennessee Ass'n of Criminal Defense Lawyers.

Michael A. Bamberger, Jacqueline S. Glassman, New York City, F. Clay Bailey, Barry Friedman, Nashville, for amici curiae American Booksellers Ass'n, et al.

OPINION

DROWOTA, Justice.

Permission to appeal has been granted to the Defendants–Appellants, Dudley W. Marshall and Carolyn A. Swanson, for the limited purpose of determining whether the statutes pursuant to which the Defendants were convicted of possession with intent to distribute obscene material (T.C.A. §§ 39–6–1101(5) and 39–6–1104(a)) violate Article I, Section 19 of the Tennessee Constitution.

The Defendants, who were employed as retail clerks in a bookstore called Paris Adult Theater in Memphis, were arrested on July 28, 1987 for their roles in selling a video cassette tape entitled "Anal Lust No. 1" to two Memphis police officers who were posing as customers. In the Criminal Court for Shelby County, a jury found the Defendants guilty of violating T.C.A. § 39–6–1104(a). Each of the Defendants was sentenced to serve four months in the Shelby County workhouse and was assessed a fine of $500.00.

The Defendants' convictions were upheld by the Court of Criminal Appeals. With respect to the issues raised by the Defendants under Article I, Section 19 of the Tennessee Constitution, the Court of Criminal Appeals relied on this Court's decision in *Leech v. American Booksellers Ass'n, Inc.*, 582 S.W.2d 738 (Tenn.1979).

This Court granted, on a limited basis, the Defendants' application for permission to appeal for purposes of considering the Tennessee constitutional issue.

As in effect at the time of Defendants' arrest on July 28, 1987, T.C.A. § 39–6–1104 provided, in pertinent part, as follows:

"(a) It shall be unlawful to knowingly send or cause to be sent, or bring or cause to be brought, into this state for sale, distribution, exhibition, or display, or in this state to prepare for distribution, publish, print, exhibit, distribute, or offer to distribute, or to possess with intent to distribute or to exhibit or offer to distribute any obscene matter."

The term "obscene" was defined, for purposes of T.C.A. §§ 39–6–1101 through 39–6–1115, in T.C.A. § 39–6–1101(5) as follows:

"(A) That the average person applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

(B) That the work depicts or describes, in a patently offensive way, sexual conduct; and

(C) That the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

The provisions of T.C.A. §§ 39–6–1104(a) and 39–6–1101(5) that were in effect in 1987 are currently codified, in substantially the same form, as T.C.A. §§ 39–17–902(a) and § 39–17–901(10), respectively.

## PERIPHERAL ISSUES

The only issue that is before the Court is whether the provisions of T.C.A. §§ 39–6–1104(a) and § 39–6–1101(5), quoted above, are in violation of Article I, Section 19 of the Tennessee Constitution. The portion of Article I, Section 19 that is pertinent to this case is as follows:

"The free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

We are dealing with a single, narrow issue. It is an issue that should not be confused with other issues that are not before the Court. To provide a clearer understanding of the limited nature of the issue before us, it may be helpful to specifically identify and list several peripheral issues that are not before us.

One issue that is not before the Court is whether the tape that the Defendants were convicted of possessing with intent to distribute, entitled "Anal Lust No. 1," was "obscene" for purposes of T.C.A. §§ 39–6–1104(a) and § 39–6–1101(5). This issue was not before the Court of Criminal Appeals (the Court of Criminal Appeals stated: "Although no challenge is made to the question of whether the tape was obscene, we have examined it and there is no question that it is."), and this issue is not before this Court. For purposes of this opinion, it is taken as true that the Defendants possessed "obscene matter" with intent to distribute it.

Another issue that should not be confused with the issue before us is whether T.C.A. §§ 39–6–1104(a) and § 39–6–1101(5) violate the First Amendment to the United States Constitution. This Court's decision in *Leech v. American Booksellers Ass'n, Inc.*, 582 S.W.2d 738 (Tenn.1979), decided in accordance with the mandate of the United States Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), established that these statutes are not in violation of the First Amendment to the Constitution of the United States.

We are not called upon to decide whether this Court has the authority to declare that the statutes under consideration violate Article I, Section 19 of the Tennessee Constitution. This Court clearly does have such authority. In *Miller v. State*, 584 S.W.2d 758 (Tenn.1979), the Court made the following observation:

"As to Tennessee's Constitution, we sit as the court of last resort, subject solely to the qualification that we may not impinge upon the minimum level of protection established by Supreme Court interpretations of the federal constitutional guarantees. But state supreme courts, interpreting state constitutional provisions, may impose higher standards and stronger protections than those set by the federal constitution. It is settled law that the Supreme Court of a state has full and final power to determine the constitutionality of a state statute, procedure, or course of conduct with regard to the state constitution, and this is true

even where the state and federal constitutions contain similar or identical provisions." 584 S.W.2d, at 760.

## TENNESSEE OBSCENITY CASES UNDER ARTICLE I, SECTION 19

In *Robert Arthur Management Corp. v. State*, 220 Tenn. 101, 414 S.W.2d 638 (1966), this Court upheld an injunction prohibiting the distribution of a motion picture film that was alleged to be obscene. In the process of upholding the injunction, the Court stated as follows:

"Under the Constitution of the United States, obscenity is excluded from constitutional protection since it is utterly without redeeming social importance. *Alberts v. State of California*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *Jacobellis v. State of Ohio*, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). *Likewise under the Constitution of the State of Tennessee obscenity has no protection.*" (Emphasis added.) 220 Tenn. 101, at 104, 105, 414 S.W.2d 638.

In *Leech v. American Booksellers Ass'n, Inc.*, 582 S.W.2d 738 (Tenn.1979), this Court held that the Tennessee Obscenity Act of 1978 violated the First Amendment of the United States Constitution and Article I, Section 19 of the Tennessee Constitution. The Court described the result of its holding in that case as follows:

"However, this does not leave Tennessee without a criminal obscenity law. An unconstitutional act that purports to supersede or repeal an existing law is ineffective to do so, since a void law has no force and effect. *State v. Dixon*, 530 S.W.2d 73, 74–75 (Tenn.1975), and cases cited therein. The result is that the prior obscenity law, 1974 Tenn.Pub.Acts, ch. 510, as amended, is in full force and effect." 582 S.W.2d at 740.

The statutes that are before the Court in this case are part of the legislation that was enacted by Public Acts of 1974, Chapter 510, which, following this Court's holding in *Leech v. American Booksellers Ass'n, Inc., supra,* were "in full force and effect."

In the process of concluding that the Tennessee Obscenity Act of 1978 violated both the federal and state constitutional provisions dealing with freedom of speech, this Court stated, in *Leech v. American Booksellers Ass'n, Inc.,* as follows:

"This Court is of the opinion that the Tennessee constitutional provision assuring protection of speech and press, Tenn. Const. art. I, § 19, should be construed to have a scope at least as broad as that afforded those freedoms by the first amendment of the United States Constitution.

It is settled constitutional law that state supreme courts may not restrict the protection afforded by the federal constitution, as interpreted by the United States Supreme Court, but they may expand constitutional protections, even where the state and federal constitutions contain similar or identical provisions.

Thus, this Court may interpret Article I, § 19, as granting absolute protection to speech and press and forbid any and all regulation of pornography in Tennessee. We have no inclination to do so." 582 S.W.2d at 745.

In addressing the issue before us in this case (whether Article I, Section 19 of the Tennessee Constitution affords greater protection to obscenity than is granted by the First Amendment of the United States Constitution), we are revisiting the identical issue that was presented in *Leech v. American Booksellers Ass'n, Inc.*

## HISTORICAL BACKGROUND OF ARTICLE I, SECTION 19 OF THE TENNESSEE CONSTITUTION

The Constitution of Tennessee that is currently in effect, including Article I, Section 19 thereof, was adopted on May 5, 1870. The 1870 Constitution replaced a Constitution that was adopted by convention in Nashville in 1834, submitted to a general vote in 1835 and became effective by a proclamation of the Governor on March 27, 1835. The 1834–35 Constitution, in turn, replaced Tennessee's first Constitution, which was adopted by convention on February 6, 1796.

The language currently contained in Article I, Section 19 of the Constitution of Tennessee was included, in almost identical form, as Section 19, Article XI of the 1796 Tennessee Constitution. There is no difference between the portion of Article I, Section 19 of the Constitution of 1870 that is pertinent to this litigation (the second sentence thereof) and the second sentence of Section 19 of Article XI of the 1796 Constitution.

Article XI of the Constitution of 1796 was the only Article of that Constitution that had a title; its title was "Declaration of Rights." Article I of the current (1870) Constitution of Tennessee is also entitled "Declaration of Rights."

Tennessee's Constitution of 1796 was adopted by a convention of 55 delegates, five from each of the state's 11 counties, who met in the early part of 1796. The adoption of a constitution was a preliminary step to the admission of Tennessee as the 16th state of the United States later that year. The historical records of the activity of the 1796 Constitutional Convention reveal very little regarding Article XI, Section 19 (Article I, Section 19 of the current Constitution). It is, however, clear that this portion of Tennessee's Constitution was taken from the Pennsylvania Constitution of 1790. *A Legal and Constitutional History of Tennessee, 1772–1972*, Lewis L. Laska, 6 Mem.St.U.L.Rev., 563 (1976). The language in the second sentence of Section 19 of the Tennessee Declaration of Rights was contained, in virtually identical form, in Article 9, Section 7 of the Pennsylvania Constitution of 1790. The same language is currently contained in Article I, Section 7 of Pennsylvania's current Constitution.

The courts in Pennsylvania have examined, in considerable detail, the origin of the language from which Article I, Section 19 of Tennessee's current Constitution was derived. The Pennsylvania courts have also considered whether this constitutional language affords any greater protection to obscene material than is afforded by the First Amendment to the United States Constitution.

In *Long v. 130 Market Street Gift & Novelty of Johnstown*, 294 Pa.Super. 383, 440 A.2d 517 (1982), the Superior Court of Pennsylvania upheld an injunction prohibiting the sale or distribution of certain obscene publications and films. In doing so, the Court reviewed the history and meaning of Pennsylvania's constitutional provision dealing with freedom of expression. The Court quoted Article I, Section 7 of the current Pennsylvania Constitution as follows:

"The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. *The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject being responsible for the abuse of that liberty.*" (Emphasis added.) 440 A.2d at 522.

The Court, in *Long v. 130 Market Street Gift & Novelty of Johnstown*, contrasted the current provisions of Article I, Section 7 of Pennsylvania's Constitution with Pennsylvania's first Constitution. The Court stated as follows:

"The Commonwealth's Constitution of 1776 guaranteed the right to freedom of expression in these words:

'That the people have a right to freedom of speech, and of writing, in publishing their sentiments; therefore, the freedom of press ought not to be restrained.'

Pa. Const. of 1776, Declaration of Rights, Section 12." 440 A.2d at 524.

The Court then discussed the change that was made to the foregoing language in adopting Pennsylvania's Constitution of 1790. The purpose of the change was to add an element of personal accountability for abuses of the freedom of expression. The Court stated as follows:

"The Constitution of 1776 did not address the question of a person's responsibility for his utterances or publications once they were made. The apparent absoluteness of the 1776 guarantee of free-

dom of expression and its capability for abuse gave rise to an exemption from its protection, for soon it became clear, that although the freedom of *expression* is arguably an absolute right, the right to *protection from prosecution for abuse of the freedom* is a limited one. As early as 1788 the Supreme Court of Pennsylvania stated:

'The true liberty of the press is amply secured by permitting every man to publish his opinion; but it is due to the peace and dignity of society to inquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame. To the latter description, it is impossible that any good government would afford protection and immunity.'

*Respublica v. Oswald,* 1 U.S. (1 Dallas) 319, 1 L.Ed. 155 (1788)." (Emphasis in original.) 440 A.2d at 524, 525.

The Superior Court of Pennsylvania stated that the sentiment expressed in the *Respublica v. Oswald* case in 1788 was expressed in the Commonwealth of Pennsylvania's new Constitution two years later in 1790. With respect to Pennsylvania's Constitution of 1790, the Court stated as follows:

"The wording under our present Constitution is identical to that in the Constitution of 1790. Pa. Const. of 1790, art. IX, § 7; Pa. Const. of 1874, art. I, § 7. In this way the guarantees of free speech and press, which Blackstone had set down merely as principles of the common law, became part of the bedrock of Pennsylvania's constitutional system. *See* IV *Blackstone's Commentaries,* 151–152. Thus we see that under our Constitutions there are two distinct elements to the right to freedom of expression. The first, arguably an absolute right, guarantees to each citizen the freedom to make public whatever he may choose. The prohibition against the prior restraint of publication serves to protect the sanctity of this right. The second, clearly a limited right, guarantees to the same citizen protection from prosecution arising from the exercise of the right of publication, except when those publications are, as Blackstone put it, somehow 'destructive of the ends of society." *Id.* It would seem that the right to trial by jury, Pa. Const., Art. I, Sections 6, 7 and 9, protects the sanctity of this more limited right." 440 A.2d at 525.

The Court stated as follows regarding the second, limited right contained in Pennsylvania's Constitution:

"We have found no authority in this Commonwealth that extends to obscene matter the limited right to exemption from prosecution or punishment for its publication, which right many other forms of expression enjoy under the second element of our Constitution's free speech guarantee." 440 A.2d at 526.

The Superior Court of Pennsylvania stated its conclusion in *Long v. 130 Market Street Gift & Novelty of Johnstown,* as follows:

"It follows therefrom that there is in Pennsylvania no fundamental right to protection from prosecution for the publication of matter abusive of the right of free expression, viz. obscene matter. In short, obscenity does not enjoy the full protection of Art. I, § 7 of the Pennsylvania Constitution of 1874." 440 A.2d at 526, 527.

In *Commonwealth v. Croll,* 331 Pa.Super. 107, 480 A.2d 266 (1984), the Superior Court of Pennsylvania followed its earlier holding in *Long v. 130 Market Street Gift & Novelty of Johnstown.* In *Commonwealth v. Croll,* the Court upheld the conviction of a defendant for sales of obscene material under a statute very similar to T.C.A. §§ 39–6–1104(a) and § 39–6–1101(5). The Court described the background of the statute and the defendant's argument with respect to the validity thereof as follows:

"Appellant concedes that the Pennsylvania Act was amended 'with slavish adherence to' the decision of the United States Supreme Court in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, rehearing denied, 414 U.S. 881, 94

S.Ct. 26, 38 L.Ed.2d 128 (1973). In spite of that, he argues that 'obscenity is impossible of definition' and that we should, therefore, 'set a higher standard for the State of Pennsylvania in obscenity criminal matters.'" 480 A.2d at 269.

The Court's holding in *Commonwealth v. Croll*, was as follows:

"It is clear to us, and we therefore hold, that Art. I, § 7 of the Pennsylvania Constitution affords no greater protection from prosecution for the distribution and sale of obscene materials than do the First and Fourteenth Amendments to the United States Constitution." 480 A.2d at 269.

The holdings of the decisions in *Long v. 130 Market Street Gift & Novelty of Johnstown* and *Commonwealth v. Croll*, have been reaffirmed by the Superior Court of Pennsylvania in *Commonwealth v. Hulehan*, 338 Pa.Super. 309, 487 A.2d 980 (1985), and in *Commonwealth v. Stock*, 346 Pa.Super. 60, 499 A.2d 308 (1985).

## CONCLUSION

There is no indication in the journals chronicling the historical development of the Constitutions of Tennessee, nor in any prior Tennessee Supreme Court cases, that the delegates to Tennessee's Constitutional Convention in 1796 intended, when they adopted, verbatim, the language that was contained in Article 9, Section 7 of the Pennsylvania Constitution of 1790, that such language have any meaning other than that which had been, and continues to be, attributed to it in the context of the Pennsylvania Constitution of 1790. The Superior Court of Pennsylvania stated that it had not found any:

"authority in this Commonwealth that extends to obscene matter the limited right to exemption from prosecution from punishment for its publication, which right many other forms of expression enjoy under the second element of our Constitution's free speech guarantees." 440 A.2d at 526.

Similarly, we have found no such authority in the State of Tennessee. Indeed, this Court's holdings in *Robert Arthur Man-*

*agement Corp. v. State, supra,* and *Leech v. American Booksellers Ass'n, Inc., supra,* are consistent with the Pennsylvania decisions discussed above. This Court held in *Robert Arthur Management Corp. v. State* that, "Under the Constitution of the State of Tennessee obscenity has no protection." 220 Tenn. 101, at 105, 414 S.W.2d 638.

■ Under Article I, Section 19 of the Constitution of Tennessee, no protection from prosecution is guaranteed for publication of material that is "destructive of the ends of society." 440 A.2d 517, at 525. The General Assembly, in enacting T.C.A. §§ 39-6-1104(a) and 39-6-1101(5), proscribed publication of material that is "patently offensive" and "appeals to the prurient interest" and that "lacks serious literary, artistic, political, or scientific value." It was reasonable for the General Assembly to conclude that such material is "destructive of the ends of society."

Notwithstanding the dramatic tone of the dissent, it can hardly be said that freedom of expression "is handed into the willing grasp of the censor [to] abolish what has been conceived to be a constitutional right." The dissent advocates the protection of obscenity as speech under the Tennessee Constitution and describes its approach as traditional. In dramatic terms it complains that the majority's view will lead to censorship. Protecting obscene speech can hardly be described as traditional. Forty-eight other states, the United States, and virtually all the countries of the civilized world interpret their Constitutions or laws as affording no protection to obscene speech. The dissent's view is not only nontraditional, it is extreme. To follow the dissent's view to its logical conclusion would result in finding the statute unconstitutional.

■ We hold that T.C.A. §§ 39-6-1104(a) and 39-6-1101(5) do not violate the provisions of Article I, Section 19 of the Tennessee Constitution. This holding does not mean that our interpretation of the protection granted to "free communication of thoughts and opinions" in Article I, Section 19 of the Constitution of Tennessee is nec-

essarily identical to the U.S. Supreme Court's interpretation of the rights granted under the First and 14th Amendments to the U.S. Constitution. We reserve our authority as "the court of last resort" in interpreting the Constitution of Tennessee.

The judgment of the Court of Criminal Appeals is affirmed. Costs will be taxed to the Appellants.

O'BRIEN and ANDERSON, JJ., concur.

REID, C.J., and DAUGHTREY, J., concur and dissent in separate opinion.

REID, Chief Justice, concurring and dissenting.

The majority holds that obscenity is not protected speech under the Tennessee Constitution. And, so, the right most essential to personal dignity and democratic government, the freedom of expression, is handed into the willing grasp of the censor. That arbiter of truth can by mere declaration, upon the claim of morality and good taste, abolish what has been conceived to be a constitutional right. Small effort is made to conceal the judicial abdication. The issue is cast as no-issue, the plea is precedent, and the rationale is self-fulfilling.

The majority avoids any discussion of the essential issue presented in the case by casting it aside as "peripheral." The majority states that "it is taken as true that the tape sold by the defendants was obscene." The statement that is taken for true is substantively irrelevant to the disposition of this case. The tape is obscene under the United States Supreme Court's interpretation of the federal constitution. At issue in this case, however, is whether any material deemed obscene by the United States Supreme Court may be protected speech under Article I, Section 19 of the Tennessee Constitution. The larger issue in this case, and the issue that compels this dissent, is whether expression may be denied protection by arbitrary definition without any showing of harm or protected competing interest. The majority holds that freedom of expression can be proscribed by mere legislative declaration. I would hold that all speech, including that that is sexually explicit, should be accorded the traditional treatment of balancing harm against right.

Respect for the constitution and deference to the important principles involved demand a reasonable discussion.

I

Permission to appeal was granted in this case in order to review, under Article I, Section 19 of the Tennessee Constitution, the constitutionality of two sections of the Tennessee obscenity statutes in effect at the time of the appellants' 1987 arrests. The appellants, employees of a Memphis retail video store, were convicted of possessing obscene material with intent to distribute in violation of T.C.A. § 39–6–1104(a) (Supp.1988). The convictions were based upon the appellants' sale of a videotape, *Anal Lust I*, containing sexually explicit material to covert police officers.

I would hold that material deemed "obscene" is not constitutionally unprotected expression, as asserted by the State; that the freedom of speech granted by Article I, Section 19 of the Tennessee Constitution is not absolute, as contended by the appellants; and that this freedom under the Tennessee Constitution is limited by competing rights also recognized by that constitution.

II

This case involves rights protected by both the federal and state constitutions. Consequently, review of the decisions by the United States Supreme Court interpreting the freedom of speech provision of the United States Constitution is helpful in the discussion of the issue under the state constitution. However, in evaluating the reach of the protection afforded by the state constitution's freedom of speech provision:

[W]e sit as a court of last resort, subject solely to the qualification that we may not impinge upon the minimum level of protection established by Supreme Court interpretations of the federal constitutional guarantees. But state supreme courts, interpreting state constitutional

provisions, may impose higher standards and stronger protections than those set by the federal constitution. It is settled law that the Supreme Court of a state has full and final power to determine the constitutionality of a state statute, procedure, or course of conduct with regard to the state constitution, and this is true even where the state and federal constitutions contain similar or identical provisions.

*Miller v. State*, 584 S.W.2d 758, 760 (Tenn. 1979).

Recognition of the principle of *stare decisis* also requires examination of past decisions of this Court regarding constitutionally protected expression. However, because this is the first case to be considered by this Court in which the sole issue is the scope of protection afforded sexually explicit material under the Tennessee Constitution, the decision should turn primarily upon the proper interpretation of Article I, Section 19, the pertinent part of which provides:

The free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

When the appellants were arrested on July 28, 1987, T.C.A. § 39–6–1104(a) (Supp. 1987) provided, in pertinent part:

It shall be unlawful to knowingly send or cause to be sent, or bring or cause to be brought, into this state for sale, distribution, exhibition, or display, or in this state to prepare for distribution, publish, print, exhibit, distribute, or offer to distribute, or to possess with intent to distribute or to exhibit or offer to distribute any obscene matter.

T.C.A. § 39–6–1101 (1982) defined the operative terms in the statute as follows:

**39–6–1101. Definitions for obscenity law.—**

. . . .

(5) "Obscene" means:

(A) That the average person applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

(B) That the work depicts or describes, in a patently offensive way, sexual conduct; and

(C) That the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(6) "Patently offensive" as used above means that which goes substantially beyond customary limits of candor in describing or representing such matters.

. . . .

(8) "Prurient interest" means a shameful or morbid interest in sex.

(9) "Sexual conduct" as used above shall be construed to mean:

(A) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. A sexual act is simulated when it depicts explicit sexual activity which gives the appearance of ultimate sexual acts, anal, oral or genital. The term "ultimate sexual acts" shall be construed to mean sexual intercourse, anal or otherwise, fellatio, cunnilingus or sodomy; or

(B) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

The issue presented for resolution is whether these statutory provisions violate the dictates of Article I, Section 19 of the Tennessee Constitution.

### III

#### A.

The appellants initially concede that the statutes at issue do not violate the First Amendment to the United States Constitution, which states that "Congress shall make no law ... abridging the freedom of speech, or of the press." Indeed, the United States Supreme Court has repeatedly held that "obscenity" is not *protected speech* under the federal constitution and is subject, therefore, to absolute prohibition. Consequently, federal decisions involving speech alleged to be obscene have, for the most part, focused on the definition of "ob-

scenity," rather than the necessary balancing of competing interests where protected speech is involved. Even so, the Supreme Court has wrestled with the issue for more than three decades, during which time the definition of obscenity, as found in decisions of that court, has changed substantially, resulting in equally substantial changes in the nature of material denied constitutional protection.

In 1957, the Supreme Court first opined that obscenity is not constitutionally protected expression. In *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), a majority of the justices formulated a test of obscenity that required an inquiry into "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." *Id.* at 489, 77 S.Ct. at 1311 (footnote omitted).

The initial success in melding a definition whereby the court could adhere to its proclamation that obscenity is not protected speech was, however, short-lived. As explained by Professor Lawrence H. Tribe in his treatise *American Constitutional Law* (2d ed. 1988):

> *Roth* presumed obscenity to be "utterly without redeeming social importance"; nine years later, in *Memoirs v. Massachusetts* [383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966)] a three-Justice plurality treated the lack of such "redeeming social importance" not as *reason* to exclude obscenity but as part of its *definition:* utter lack of redeeming social significance became one of "three elements [that] must coalesce" in order for material to be condemned as obscene; in addition, it had to be shown that "the dominant theme of the material taken as a whole appeals to a prurient interest in sex," and that "the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters." Because Justices Black and Douglas would have reversed essentially all obscenity convictions, that plurality opinion established a floor for subsequent obscenity prosecutions, but not un-

til 1973 could any five Justices agree on a definition of "what constitutes obscene, pornographic material subject to regulation under the States' police power." In 1973, in *Miller v. California,* [413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)] a five-Justice majority converged on a modified "test": "The basic guidelines for the trier of fact must be: (a) whether the 'average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, ...; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

*Id.* at 909 (footnotes omitted) (emphasis in original). Tribe summarized this evolution of the definition as follows:

> Thus the Court had moved from a view in which the obscene was unprotected *because* utterly worthless (*Roth*), to an approach in which the obscene was unprotected *if* utterly worthless (*Memoirs*), to a conclusion in which obscenity was unprotected even if *not* "utterly" without worth (*Miller*).

*Id.,* at 909 (emphasis in original). The author then continues:

> There is little likelihood that this development has reached a state of rest—or that it will ever do so until the Court recognizes that obscene speech *is* speech nonetheless, although it is subject—as is all speech—to regulation in the interest of unwilling viewers, captive audiences, young children, and beleaguered neighborhoods—but *not* in the interest of a uniform vision of how human sexuality should be regarded and portrayed.

*Id.* at 909–10 (footnotes omitted) (emphasis in original).

The Supreme Court's lack of success in formulating a satisfactory, lasting definition of obscenity was recognized 16 years after *Roth* by Justice Brennan, the author of the *Roth* opinion. In *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628,

37 L.Ed.2d 446 (1973), Justice Brennan, dissenting, noted:

> Our experience with the *Roth* approach has certainly taught us that the outright suppression of obscenity cannot be reconciled with the fundamental principles of the First and Fourteenth Amendments. For we have failed to formulate a standard that sharply distinguishes protected from unprotected speech....

*Id.* at 83, 93 S.Ct. at 2647 (Brennan, J., dissenting). The suggestion that the Court's definition of obscenity is likely to change found further support in Justice Scalia's concurrence in *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), in which he stated, "All of today's opinions, I suggest, display the need for reexamination of *Miller." Id.* at 505, 107 S.Ct. at 1923.

#### B.

Although, as stated by Justice Scolnik concurring and dissenting in *City of Portland v. Jacobsky,* 496 A.2d 646, 652 (Me. 1985), "[t]he superficial simplicity of reducing the legal issue to one of definition obscures the essential complexity of its application," several state courts, nevertheless, have followed the example of the United States Supreme Court and held that obscenity, as defined in *Miller v. California,* is not protected expression under their state constitutions. *See, e.g., People v. Ford,* 773 P.2d 1059 (Colo.1989); *Stall v. State,* 570 So.2d 257 (Fla.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2888, 115 L.Ed.2d 1054 (1991); *City of Portland v. Jacobsky,* 496 A.2d 646 (Me.1985); *City of Urbana, ex rel. Newlin v. Downing,* 43 Ohio St.3d 109, 539 N.E.2d 140, *cert. denied,* 493 U.S. 934, 110 S.Ct. 325, 107 L.Ed.2d 315 (1989); *State v. Reece,* 110 Wash.2d 766, 757 P.2d 947 (1988), *cert. denied,* 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 26 (1989). To support those holdings, the courts have reasoned that because statutes prohibiting obscenity existed at the time their respective state constitutions were adopted, the obscenity "exception" to the freedom of expression guarantees of those charters, like perjury and other ex-

ceptions, is a part of the common law. For example, the Washington Supreme Court, deciding five to four in *State v. Reece, supra,* held that the Washington Constitution does not protect obscene speech, stating:

> [T]here are differences between statutory and constitutional construction. "[A] constitution is an expression of the people's will and depends for its validity on their ratification. Thus, the 'common and ordinary meaning' in which the constitution's words must be construed is the meaning they would have had to the vast majority of ordinary voters." It is therefore relevant to note that obscenity was criminalized both immediately prior to and after the ratification of the state constitution.

757 P.2d at 954 (citation omitted).

In contrast, the Oregon Supreme Court ruled in *State v. Henry,* 302 Or. 510, 732 P.2d 9 (1987), that obscenity, as defined in *Miller,* is not "an original or modern version of an historically established exception to the protection afforded freedom of expression" by that state's constitution. 302 Or. at 514, 732 P.2d at 11. That court, construing language in the Oregon Constitution similar to that of Article I, Section 19 of the Tennessee Constitution, thus held:

> In this state any person can write, print, read, say, show or sell anything to a consenting adult even though that expression may be generally or universally considered "obscene."

302 Or. at 525, 732 P.2d at 18.

Whether obscenity was a crime at common law is at least a disputed issue. What is not disputed is that during the early history of our jurisprudence the purpose of those laws that are deemed by some authorities, in retrospect, to have criminalized obscenity, was to punish, directly or indirectly, impiety or criticism of the government. Something more than being sexually explicit was necessary to make a publication criminal under the English common law. "That which was merely bawdy, without offending the church or the state, was tolerated." F. Schauer, *The Law of Ob-*

scenity 3 (1976) (citing *The Report of the Comm'n on Obscenity and Pornography* 349 (New York Times ed. 1970); R. Findlater, *Banned! A Review of Theatrical Censorship in Britain* 10–35 (1967)). Also, the Revolutionary War was fought by the colonists in a large measure to rid themselves of limitations in the English common law on the freedom of speech and of the press in whatever forms they were disguised. This point was made by Justice Douglas in his concurring opinion in *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), when he quoted from *Bridges v. California*, 314 U.S. 252, 264, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941), as follows:

> [T]o assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, Freedom of the Press in the United States, 9 Publications Amer. Sociol.Soc. 67, 76.

*Memoirs v. Massachusetts*, 383 U.S. at 429, 86 S.Ct. at 983 (Douglas, J., concurring).

### C.

The earliest prosecution in Tennessee for obscene *printed* material, to which the Court's attention has been directed, was *State v. Pennington*, 73 Tenn. 506 (1880). The offense charged in that case was that of introducing obscene pictures into a school. The prosecution was based on Section 4847 of the 1858 Code, a section that provided:

> If any person print, publish, import, sell or distribute any book, pamphlet, ballad or any printed paper containing obscene language or obscene prints, pictures or descriptions, manifestly tending to corrupt the public morals; or introduce the same into any family, school or place of education; or have the same in his possession for the purpose of loan, sale, exhibition or circulation, with intent to introduce the same into any family, school or place of education, he shall be guilty of a misdemeanor.

73 Tenn. at 506. That statute, which later was held to violate the First Amendment to the United States Constitution in *Ellenburg v. State*, 215 Tenn. 153, 384 S.W.2d 29 (Tenn.1964), made printing or distributing obscene material a crime only if such action "manifestly tend[s] to corrupt the *public* morals." (Emphasis added.) The statute also made *possession* of obscene material a crime only if accompanied by the intent to introduce the material "into any family, school or place of education."

The other cases relied upon by the State to support its argument that obscenity was an indictable offense at common law in Tennessee also involved public display or demonstration rather than discreet conduct like that for which the appellants in this case were convicted. The prosecution in *Grisham v. State*, 10 Tenn. 589 (1831), did not even involve speech. The appellants in that case were convicted for adultery upon an indictment which charged that they

> unlawfully, wilfully, wickedly, and scandalously, did then and there live, cohabit, and use together as man and wife, in lewd acts of fornication and adultery, openly, notoriously and publicly, they not being married, . . . .

*Id.* at 590. The Court held that conduct "notoriously against public decency and good manners" constituted an indictable offense and stated further:

> When Judge Blackstone says that the crime of adultery is not taken cognizance of by the temporal courts, this is to be understood of secret and private adultery; for if open and notorious, it comes within his description of a grossly scandalous and public indecency.

*Id.* at 594–95 (citing 4 Blackstone Commentaries 64, 65).

In *Britain v. State*, 22 Tenn. 203 (1842), the indictment charged that the defendant

> . . . did unlawfully commit open and notorious lewdness by then and there unlawfully, obscenely, and of purpose causing and permitting his said slaves to go about in said county, so naked and destitute of clothing, . . . .

*Id.* In affirming the conviction, the Court held that the evidence supported the

charge that the defendant was "guilty of lewdness." *Id.* at 204.

In *Bell v. State*, 31 Tenn. 42 (1851), the defendant was indicted and convicted for "the utterance of certain grossly obscene words in public" that "relate to acts of criminal intercourse." *Id.* at 42–43. The Court found the conviction was without precedent but likened it to "libel upon a private individual," "contempt to a public functionary," and "seditious or treasonable act towards the government." *Id.* at 47. The Court also found the act to be a "gross violation of good morals and public decency" and affirmed the conviction. *Id.* at 47.

In *State v. Graham*, 35 Tenn. 134 (1855), the defendant was charged with public profanity. The charge was that the defendant,

> in a public place, and in the presence and hearing of divers good citizens of the State, then and there being, unlawfully did utter, publish, speak and say, the following gross, scandalous, profane and blasphemous language.... To the great scandal and common nuisance of all good citizens so then and there being as aforesaid, to the manifest corruption of public morals....

*Id.* at 135. On appeal from dismissal of the charge, the Court held that the presentment stated an indictable offense. The Court emphasized the public nature of the act with the following statement:

> Sobriety in public, as laid down by Blackstone in his Commentary, is a duty every man owes to the community, and the violation of which is indictable. Not so as to private acts of drunkenness—that is only hurtful to himself, and not his neighbors.
>
> The principle pervading all our laws, in relation to the description of offences under consideration, is, that, with the private views of citizens, the community, as such, will not concern itself, but leave them to the lash of conscience and the frowns of neighbors; but when their vicious acts are public, they will be dealt with as *crimes*, because of their tendency to disturb and annoy others, and exert

a baneful influence upon the morals and habits of the community.

*Id.* at 138–39 (emphasis in original).

In *Young v. State*, 78 Tenn. 165 (1882), the indictment charged that the defendant did

> publicly use profane and blasphemous and obscene language in the hearing of divers citizens so as to become a nuisance....

*Id.* at 165–66. The Court affirmed the conviction holding that the offense was "a public or common nuisance." *Id.* at 166.

While the State has taken a few 19th-century cases that penalized notorious public acts of impiety or heresy and attempted to find in those cases "a common law exception of obscenity" that survived the plain language of the constitution, no such conclusion can logically be drawn from those cases. Speech and publications that are not public and are not directed at children, bear no resemblance to the notorious *acts* punished at common law. Those cases, therefore, do not support the State's argument that "obscenity" was a crime at common law and, therefore, Article I, Section 19 of the Tennessee Constitution affords no protection to material deemed obscene under the *Miller* test.

### D.

While some more recent decisions by the Court have *commented* that obscenity is not constitutionally protected expression, they have provided no analysis whatsoever of the language or history of the Tennessee Constitution and have relied entirely upon the federal constitution and federal decisions. In *Robert Arthur Management Corp. v. State*, 220 Tenn. 101, 414 S.W.2d 638 (Tenn.1967), *rev'd* 389 U.S. 578, 88 S.Ct. 691, 19 L.Ed.2d 777 (1968), the Court upheld an injunction prohibiting the distribution of a film "not ... protected by the First Amendment to the constitution of the United States." 414 S.W.2d at 641. The opinion contained no discussion of the Tennessee constitution, except for the conclusory statement, "Likewise under the Constitution of the State of Tennessee obscenity has no protection." *Id.* at 640. In *Tay-*

lor v. State, ex rel. Kirkpatrick, 529 S.W.2d 692 (Tenn.1975), cert. denied, 429 U.S. 930, 97 S.Ct. 337, 50 L.Ed.2d 300 (1976), the claim was that the statutory definitions of the terms "obscene" and "sexual conduct" were "so vague and indefinite that they violate[d] Article I, Section 19 of the Constitution of Tennessee and the First and Fourteenth Amendments of the United States Constitution." *Id.* at 696. The Court, stating that "[t]his statute represents a good faith effort by our General Assembly to comply with the standards recently announced by the Supreme Court of the United States in *Miller v. California,*" rejected the charge that the definitions violated substantive due process under the United States Constitution. *Id.* The Tennessee Constitution was not otherwise mentioned.

None of the cases relied upon by the majority come close to meeting the test for determining that a case has been decided upon "adequate and independent state ground" as provided in *Michigan v. Long,* 463 U.S. 1032, 1037, 103 S.Ct. 3469, 3474, 77 L.Ed.2d 1201 (1983). The prior decisions of this Court fit precisely the United States Supreme Court's criteria for finding that a decision is based on federal, not state, law:

> Accordingly, when, as in this case, a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.

*Id.* at 1040, 103 S.Ct. at 3476.

However, other prior decisions of the Court are consistent with the decision advocated in this dissent, that speech, writing, printing, and expression by other means, though subject to regulation in the interest of other protected rights, is speech within the meaning of the "any subject" provision of Article I, Section 19. Those cases already have recognized, though not determined the extent of, that protection.

The latest and most significant decision of this Court regarding obscenity is *Leech v. American Booksellers Ass'n, Inc.,* 582 S.W.2d 738 (Tenn.1979). The State insists that regardless of the language of Article I, Section 19, the Court in *Booksellers* "expressly refused to expand the scope of Article I, Section 19 beyond that of the First Amendment." Until today, we could say the State misreads *Booksellers.* However, the majority states, equivocally, "We are revisiting the identical issue that was presented in *[Booksellers ]*." In that case, this Court undertook to review "the tortured history of [United States] Supreme Court decisions dealing with the 'intractable obscenity problem.' " *Id.* at 740 (quoting *Interstate Circuit, Inc. v. City of Dallas,* 390 U.S. 676, 704, 88 S.Ct. 1298, 1313, 20 L.Ed.2d 225 (1968) (Harlan, J., concurring and dissenting)). The Court declared that although it "may interpret Article I, Section 19, as granting absolute protection to speech and press and forbid any and all regulation of pornography in Tennessee," it had "no inclination to do so." *Id.* at 745. Again, however, this Court's pronouncement that it would not in that case interpret Article I, Section 19 of the Tennessee Constitution more broadly than the First Amendment to the United States Constitution was not accompanied by any examination or analysis of the state constitutional provision. Furthermore, any such analysis would have been dictum because the Court found the statute at issue in *Booksellers* in violation of the minimum free speech protections provided by the federal constitution and, thus, void. The only statements made by the Court in *Booksellers* regarding the scope of protection afforded the right of expression under Article I, Section 19 were as follows:

> This Court is of the opinion that the Tennessee constitutional provision assuring protection of speech and press, Tenn. Const. art. I, § 19, should be construed to have a scope at least as broad as that afforded those freedoms by the first amendment of the United States Constitution.
>
> It is settled constitutional law that state supreme courts may not restrict

the protection afforded by the federal constitution, as interpreted by the United States Supreme Court, but they may expand constitutional protections, even where the state and federal constitutions contain similar or identical provisions.

Thus, *this Court may interpret Article I, § 19, as granting absolute protection to speech and press and forbid any and all regulation of pornography in Tennessee. We have no inclination to do so.* On the other hand, we cannot encroach one step farther than the United States Supreme Court in restricting speech and press, and therefore cannot give constitutional approval to any law expanding the standards for adjudicating obscenity, *vel non,* beyond the dictates of *Miller* and its progeny.

582 S.W.2d at 745 (emphasis added).

The Court then examined the Tennessee statute and found that when tested against the federal constitutional standard as stated in *Miller,* the statute violated the federal and state constitutions. The Court found that since the statute was void because it criminalized expression protected by the federal constitution, it was not necessary to state the precise limits of the protection provided by the Tennessee Constitution. The Court, however, did establish the minimum and maximum limits of protection afforded by Article I, Section 19, which are that protection is *"at least as broad as"* that provided by the First Amendment, and, at a maximum, may provide *"absolute protection* to speech and press and forbid any and all regulation of pornography."￼ The Court's finding in *Booksellers* that the statutes under which the appellants were convicted were "in full force and effect" had no reference to the constitutionality of the statute, but only to the conclusion that the enactment of the obscenity statute found to be unconstitutional in *Booksellers* did not repeal the previous statute. The issue the Court found unnecessary to decide in *Booksellers,* the extent to which sexually explicit expression may be regulated under Article I, Section 19, is now, for the first time, before the Court for resolution. The suggestion that this important constitutional issue has been considered and resolved by this Court indicates an apparent unwillingness to expose the faulty basis on which the majority opinion rests.

## IV

### A.

This review of the more significant decisions by the United States Supreme Court construing the free speech provision of the First Amendment, the decisions from other states construing provisions in their constitutions similar to our Article I, Section 19, and the decisions of this Court regarding freedom of expression indicates that resolution of the issue presented, the extent to which expression may be regulated, must be found in the history and language of Article I, Section 19 itself.

A statement of the standard whereby the constitution should be examined will aid in that undertaking. The standard was set forth by this Court in *Prescott v. Duncan,* 126 Tenn. 106, 148 S.W. 229 (1912), in which the Court warned against the temptation to interpret the constitution when interpretation is not needed. The Court stated:

The object of construction, as applied to a written Constitution, is to give effect to the intent of the people in adopting it, and this intent is to be found in the instrument itself. It is to be presumed that language has been employed with sufficient precision to convey the meaning intended, and, unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it. . . .

. . . .

". . . . When these [constitutions] assume to make any change in the common law, the change designed is generally a radical one, but as they do not go minutely into particulars, as do statutes, it will sometimes be easy to defeat a provision if courts are at liberty to say that they will presume against any intention to alter the common law further than is expressly declared. A reasonable construc-

tion is what such an instrument demands and should receive, and *the real question is what the people meant, and not how meaningless their words can be made by the application of arbitrary rules."* 148 S.W. at 234 (citing Cooley's Constitutional Limitations) (citations omitted) (emphasis added).

Consideration of the language of the Constitution of 1796 and comparable provisions in other constitutions with which the delegates to the 1796 convention were familiar compels the conclusion that the framers of Tennessee's constitution intended to provide to the people of this state the broadest possible freedom consistent with an orderly society. Some insight into the delegates' intentions regarding personal liberties can be gained from a comparison of the provisions regarding freedom of religion found in the constitution of the State of Franklin, obviously rejected by the Tennessee delegates, and that included in the Tennessee Constitution. Section 32 of the provisional Constitution of the State of Franklin provided as follows:

That no person shall deny the being of a God or the truth of the Protestant religion or the divine authority either of the Old or New Testament, or who shall hold religious principles incompatible with the freedom and safety of the State, shall be capable of holding any office or place of trust or profit in the civil government within this state.

The comparable provision of the Tennessee Constitution declared:

That no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any minister against his consent; that no human authority can in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or modes of worship.

Tenn. Const. Art. XI, § 3 (1796).

The provision in the Tennessee Constitution establishing freedom of religion stands in stark contrast to that in the State of Franklin Constitution, which required a religious test for state officials. By analogy,

it is not unreasonable to believe that the delegates had a similar intent to expand the guarantee of freedom of expression beyond those bounds previously experienced by the drafters.

The delegates to the convention chose not to adopt the language of the First Amendment, which had been approved only five years earlier:

Congress shall make no law ... abridging the freedom of speech, or of the press.

Article I, Section 19 is obviously more expansive than the wording of the First Amendment. This language has been stated by the Court to be "a substantially stronger provision than that contained in the First Amendment to the Federal Constitution ...," *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn.1978), a holding not mentioned by the majority.

The convention also rejected the language used in the constitution of Tennessee's mother state, North Carolina:

That the freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained.

N.C. Const. § 15 (1776). Instead, the delegates to the convention chose to adopt for Tennessee the language most expansive of all models, that found in the Pennsylvania Constitution of 1790. This emphasis on individual freedoms was reaffirmed when Tennessee's constitution was amended in 1870 after the state's re-entry into the union following the Civil War. Rather than merely *prohibiting* the enactment of laws *abridging* the freedom of speech and press, Article I, Section 19 *affirmatively declares* the right of expression on *any* subject, limited only by the abuse of that freedom. It declares three principles: liberty of expression is an invaluable right; liberty of expression extends to any subject; and violation of other recognized rights is the abuse which imposes responsibility and, to that extent, limits the freedom of expression. In summary, the history and language of Article I, Section 19 compel the interpretation that affords the greatest protection of expression consistent with the

protection of competing constitutional rights.

When the constitution was revised in 1870, the Declaration of Rights was made the first article, and the convention, fearful that the Declaration of Rights, including Article I, Section 19, might be relegated to some subordinate status, adopted Article XI, Section 16 of the Constitution, which provides:

> The declaration of rights hereto prefixed, is declared to be a part of the Constitution of this State, and shall never be violated on any pretence [sic] whatever.

The framers have proved to be prophetic; they foresaw times in which legislators and judges would undertake to subvert the plain meaning of their words in order to suppress unpopular ideas and unorthodox expression, to barter liberty for conformity. When we read the plain words of Article I, Section 19, when we consider the declaration that freedom of expression is the *invaluable right* of all citizens, and when we read the exhortation that these rights should never be violated on *any pretense* whatsoever, we can fairly hear the wisdom of our ancestors shouted across the generations—only in freedom is there dignity and security; only in truth is there freedom; truth abhors inerrancy, dogma subverts understanding, and implicit in censorship is the titillating savor of power and elitism, ever-abiding threats to freedom.

The purpose of any constitution is to protect the rights of the minority, those whose views do not conform to current community standards. The duty of the courts is to protect the "invaluable" right of expression, even though the material protected may include that which is crude and offensive.

It is not unreasonable to find that our forefathers had the wisdom to impose upon government, with its bias for the conventional and its antipathy for the unorthodoxy, exacting limitations with regard to the regulation of expression. The advisability of this restraint was recognized by the Court more than a century ago, in *State v. Graham*, 35 Tenn. 134, 139 (Tenn. 1855), with the statement: "[L]eave [the private views of citizens] to the lash of conscience and the frowns of neighbors." This same wisdom, better said, is found in the words of poet John Milton, Puritan partisan and contender for freedom against government and church. In "Areopagitica," subtitled "A Speech for the Liberty of Unlicensed Printing to the Parliament of England," given in 1644, Milton said:

> [T]hough all the winds of doctrine were let loose to play upon the earth, so truth be in the field, we do injuriously, by licensing and prohibiting, to misdoubt her strength. Let her and falsehood grapple; whoever knew truth put to the worse in a free and open encounter?

.  .  .  .  .

> Read any books, whatever come to thy hands, for thou art sufficient both to judge aright and to examine each matter.

J. Milton, *Areopagitica*, in Great Books of the Western World 389 (1952).

In the absence of demonstrated substantial and preventable harm, which the State has a duty and the power to prevent, expression relating to aesthetics and morality, whether pertaining to human sexuality or otherwise, is, under the constitution, left to individual discretion and conscience and the influence of social and moral forces, rather than to the criminating hand of the government's police power. Adult members of the public can protect themselves from portrayals of the sexually explicit by simply not reading, viewing, listening, or buying it, just as they can protect themselves from portrayals of violence, avarice, degradation, depravity, and crime by the same means. The constitution reflects the principle that the people truly are "sufficient both to judge aright and to examine each matter." J. Milton, *supra*.

### B.

The accommodation of competing rights, within the outside bounds recognized in *Booksellers*, was discussed by the Court in *H & L Messengers, Inc. v. City of Brentwood*, 577 S.W.2d 444 (Tenn.1979). In that case, which involved commercial speech, the Court set forth principles for judging

the extent to which expression may be regulated. The plaintiffs attacked the constitutionality of a city ordinance prohibiting the depositing of commercial and non-commercial handbills on private premises but excluding from the provisions of the ordinance religious and political material. The Court found that "the right to circulate," as well as the rights to speak, write, and print, is protected by the constitution and held the ordinance void because of vagueness and because it was not content neutral. With regard to basic principles applicable to the right of free speech under Article I, Section 19, the Court stated:

All discussion must start with the realistic recognition that commercial speech enjoys a qualified protection under the First Amendment and under Article I, Section 19 of the Constitution of Tennessee. Neither constitutional provision is subject to analysis in terms of absolutes; all basic rights of free speech are subject to reasonable regulation.

*Id.* at 451.

The balancing of the freedom of expression against recognized competing rights is the same procedure followed by the United States Supreme Court in construing statutes that infringe upon speech, other than speech deemed unprotected under *Miller.* This thinly veiled fiction was recognized by the Supreme Court in *R.A.V. v. City of St. Paul, Minnesota,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), a case in which a city ordinance banned expression that constituted "fighting words" within the meaning of *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), in which Justice Scalia, writing for the Court, noted:

We have sometimes said that these categories of expression are "not within the area of constitutionally protected speech," *Roth, supra,* 354 U.S., at 483, 77 S.Ct., at 1308; *Beauharnais* [ *v. Illinois,* 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919 (1952) ]; *Chaplinsky, supra,* 315 U.S., at 571–572, 62 S.Ct., at 768–769; or that the "protection of the First Amendment does not extend" to them, *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 504,

104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984); *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 124, 109 S.Ct. 2829, 2835, 106 L.Ed.2d 93 (1989). Such statements must be taken in context, however, and are no more literally true than is the occasionally repeated shorthand characterizing obscenity "as not being speech at all," Sunstein, Pornography and the First Amendment, 1986 Duke L.J. 589, 615, n. 146. What they mean is that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.

*R.A.V. v. City of St. Paul, Minnesota,* —— U.S. at ——, 112 S.Ct. at 2543 (emphasis in original).

The Supreme Court recognized that competing interests must be balanced in a case involving the prohibition of telephonic communication of sexually explicit expression which was only "indecent" rather than "obscene," *Sable Communications v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989), the Court stated:

The government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest.

This Court recently decided *Freeman v. Burson,* 802 S.W.2d 210 (Tenn.1990), in which a challenged statute prohibited solicitation of votes and display or distribution of campaign material within 100 feet of an entrance to a polling place. The Court held that a regulation which restrains speech on the basis of its content is presumed to violate the First Amendment and that:

[s]uch a regulation may be upheld only if the State can prove that "the burden

placed on free speech rights is justified by a compelling state interest. The least intrusive means must be utilized by the State to achieve its goals and the means chosen must bear a substantial relation to the interest being served by the statute in question."

*Id.* at 213 (quoting *Bemis Pentecostal Church v. State,* 731 S.W.2d 897, 903 (Tenn.1987), *cert. denied,* 485 U.S. 930, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988)). After balancing the competing interests involved, the Court found that the State had shown a compelling interest in preventing interference with voting, but held that the statute was "not narrowly tailored to advance the State's interest." *Id.* On appeal, the United States Supreme Court applied its balancing principle:

> The State must show that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."

*Burson v. Freeman,* — U.S. —, —, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992) (quoting *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). The United States Supreme Court found that the interest protected by the State was compelling and that:

> [t]he only way to preserve the secrecy of the ballot is to limit access to the area around the voter. Accordingly, [that Court held] that *some* restricted zone around the voting area is necessary to secure the State's compelling interest.

*Id.* at —, 112 S.Ct. at 1846 (footnote omitted). That Court found that the Tennessee statute establishing a 100–foot boundary does not violate the United States Constitution and reversed the decision of this Court. Both this Court and the United States Supreme Court balanced the limitation on expression against a recognized competing interest, the procedure advocated in this dissent, even though they reached different decisions.

### C.

The only authority relied upon by the majority, other than two prior decisions of this Court discussed above, is that of the intermediate court of Pennsylvania. In *Long v. 130 Market Street Gift & Novelty of Johnstown,* 294 Pa.Super. 383, 440 A.2d 517 (1982), the Pennsylvania court held that the right to sell material, found by a jury to be obscene as defined by *Miller,* was not a fundamental right for the purpose of equal protection analysis. That court, construing language identical to Article I, Section 19 stated:

> It follows therefrom that there is in Pennsylvania no fundamental right to protection from prosecution for the publication of matter abusive of the right to free expression, *viz.* obscene matter. In short, obscenity does not enjoy the *full* protection of Art. I, § 7 of the Pennsylvania Constitution of 1874. (Emphasis added.)

440 A.2d at 526–27. The court, construing language identical to that of Article I, Section 19, concluded that the state constitutional limitation on the freedom of expression, "subject to the abuse of that liberty," applied to expression that is "destructive to the ends of society." 440 A.2d at 525 (quoting IV Blackstone, *Commentaries* 151–52). In response to an equal protection challenge to an injunction prohibiting the sale or distribution of certain sexually explicit publications and films, that court found that the State's interest in defeating "the stranglehold of organized crime over legitimate businesses" and preventing "the economic and moral exploitation" of the State's citizens provided "a rational basis" on which to prohibit the sale of the material in question, while exempting museums, libraries, and historical societies. *Id.* at 528.

The Pennsylvania court recognized that the United States Supreme Court proscribed by defining and found that under the Pennsylvania constitution freedom of expression can be limited only by an abuse of that right. The court stated:

> Thus, the important question in *Pennsylvania* is not whether arguably obscene material is speech or nonspeech, but whether the particular exercise of free expression is protected from prosecution or subject to criminal penalty or

not. Indeed, our exhaustive research has revealed no case which holds that obscene matter is not speech *under the Commonwealth's Constitution.* To the contrary, however, our cases have often stated that obscenity is not speech under the *federal Constitution. See Ranck v. Bonal Enterprises, Inc.,* 467 Pa. 569, 359 A.2d 748 (1976).

We need not determine whether obscene matter is speech within the definition of our Constitution since it is clear that even speech protected by the first part of our free speech guarantee is not protected from prosecution and punishment once it has been determined by a jury *to constitute an abuse* of the right to free expression.

*Long v. 130 Market St. Gift & Novelty of Johnstown,* 440 A.2d 517, 526 n. 15 (1982). That opinion supports the procedure advocated in this dissent, *i.e.,* that speech is protected until *it has been determined by a jury* to be *an abuse.* There is an important distinction between a judicial determination that material constitutes an abuse and a judicial determination that material fits a definition. The majority, arbitrarily it appears, constitutionalizes the latter.

The appellants' claim that Article I, Section 19 affords absolute protection of sexually explicit speech cannot be sustained. Nor, in my view, should the State's position, adopted by the majority, that sexually explicit speech can be proscribed by arbitrary definition. The constitutional protection cannot be based on subject matter but extends to speech on *any subject.* Restrictions on expression that single out "speech of a particular content for special treatment" is forbidden by the constitution. *H & L Messengers, Inc. v. City of Brentwood,* 577 S.W.2d at 452. Article I, Section 19, by its terms, requires a finding of abuse as justification for any limitation. Any abuse of the liberty justifying its limitation must be found in some harmful effect of the expression. The justification in areas such as commercial speech, defamation, and perjury are well recognized. However, with regard to sexually explicit expression, there is less agreement, mainly because most discussion has revolved around the United States Supreme Court's treatment of the issue. Our constitution requires consideration of the harm that may be caused by speech, including that defined by the statute as obscene, and the State's interest in its regulation. The constitution also requires consideration of the free communication of thoughts and opinions declared by it to be an invaluable right. Thus, sexually explicit speech, however defined, should be accorded the traditional treatment of balancing the harm against the right. Such regulation must articulate relevant factual standards whereby substantial and preventable harm to identifiable persons can be judged. Upon an adequate showing of a nexus between the expression to be regulated and the harm that may be prevented by the regulation, the right of expression may be regulated if the least intrusive means of regulation is utilized. *Bemis Pentecostal Church v. State,* 731 S.W.3d 897, 903 (Tenn.1987).

The convictions in this case should be sustained by using the balancing of interests procedure. *Anal Lust I* meets the most restrictive definition of "hard core pornography" and is, by the most liberal definition, of minimal worth. Consequently, small justification is needed to prohibit its distribution. Such material can have a substantial impact beyond expression of ideas regarding esthetics and morality pertaining to human sexuality. The finding of the existence of that impact, the determination that it is harmful, and the balancing of harm against the right is, within constitutional limits, the prerogative of the legislature.

It cannot be said on the record now before the Court that the legislature did not have a reasonable basis for determining that harm would result from the distribution of the material upon which the convictions in this case are based. First we must presume, in the absence of a showing to the contrary, that the legislature did not pass an unconstitutional act. *See, e.g., Marion County Board of Commissioners v. Marion County Election Commission,* 594 S.W.2d 681, 684 (Tenn.1980). Second,

and more importantly, the appellants have not contended that any harm sought to be prevented by the statute does not exist or is insignificant or that the nexus between the regulated expression and the harm is *too tenuous to withstand scrutiny.* They have asserted, unsuccessfully, an absolute privilege. "It is well settled that it is incumbent upon a person attacking the constitutionality of a statute to carry the burden of proof." *Terrell v. State,* 210 Tenn. 632, 641, 361 S.W.2d 489, 493 (1962).

I would hold that all expression, including sexually explicit expression, is speech within the meaning of Article I, Section 19, that expression may be limited only to protect a compelling state interest, that the means used to protect competing interest must bear a substantial relation to an identified harm, and that the least intrusive means must be utilized to accomplish the state interest.

I would further hold that the record does not demonstrate that the statutes under which the appellants were convicted are void for overbreadth, under the construction of Article I, Section 19 herein advanced.

I, therefore, agree that the convictions should be affirmed, although not for the reason given by the majority. I am authorized to say that Justice Daughtrey joins me in this opinion.